United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 26, 2005**

Charles R. Fulbruge III
Clerk

REVISED AUGUST 9, 2005

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 04-10965

PCI TRANSPORTATION INC,

                                        Plaintiff-Appellant

versus

FORT WORTH & WESTERN RAILROAD COMPANY,

                                        Defendant-Appellee

On Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, WIENER and CLEMENT, Circuit Judges.

WIENER, Circuit Judge:

Appellant PCI Transportation, Inc. ("PCI") appeals the district court's orders denying (1) remand, and (2) a preliminary injunction. We affirm.

## I. FACTS AND PROCEEDINGS

PCI receives and distributes rail cargo in Fort Worth, Texas, via a distribution warehouse serviced by a spur that comes off of railroad lines of the Union Pacific Railroad ("Union Pacific") and the Burlington Santa Fe Railroad ("BNSF"). Appellee Fort Worth & Western Railroad Co. ("FWWR") is a short-line railroad that

operates passenger and freight trains within Texas.  FWWR operates a switching yard that, via PCI's spur, links its warehouse to the Union Pacific and BNSF railroads.  Under various agreements, Union Pacific and BNSF deliver railcars to FWWR's switching yard, after which FWWR switches and delivers these cars to customers of Union Pacific and BNSF, such as PCI, for unloading.  After the railcars are unloaded, FWWR returns the empty cars to the main railroads' lines.  BNSF and Union Pacific compensate FWWR for its switching services, but the railroads also charge FWWR for the time that it retains the railcars at its switching yard.  In turn, FWWR collects demurrage[1] fees from end-use customers such as PCI.

In August 2001, after a dispute had arisen concerning demurrage charges imposed on PCI by FWWR, these parties entered into a contract (the "contract") aimed at avoiding further conflict, a goal that the contract has obviously failed to attain. The entire contract is a one page letter, and is self-styled with two different names —— "Confidential Demurrage Contractual Agreement" and "Confidential Contractual Agreement for Free Time." The language of the contract provides that (1) PCI will have four demurrage-free days, and (2) FWWR is committed to providing PCI with a minimum of one "switch" daily, seven days per week.  The contract also establishes the demurrage rate applicable after free

---

[1] Demurrage is a charge assessed for detaining a freight car, truck, or other vehicle beyond any free time stipulated for loading or unloading.

time expires.  (The contract was never placed in evidence before the district court, but following oral argument on appeal, it was submitted to us under seal.)  PCI alleges that, since the execution of the contract and in conformity with common industry practice, FWWR has delivered cars to PCI on a first-in, first-out ("FIFO") basis.

In February 2004, more than two years after execution of the contract, a new dispute arose between PCI and FWWR concerning demurrage charges for the month of June 2003.  PCI contends that FWWR had engaged in several practices that resulted in improper demurrage fees being charged to PCI, to wit: (1) FWWR varied from its practice of delivering cars to PCI on a FIFO basis, with the result that FWWR held cars intended for PCI's customers for longer than four days; (2) at times, FWWR had delivered rail cars on PCI's spur backwards, making it impossible for PCI to unload those cars and requiring FWWR to move the cars out, reverse them, then bring them back in again with the next group of cars; (3) FWWR provided PCI with a delivery schedule the effect of which virtually guaranteed that some of the cars would be held in the FWWR yard for more than four days, thereby unnecessarily incurring demurrage costs.

PCI filed suit in state court alleging that FWWR had breached the contract.  PCI also claimed intentional interference with contractual relations and requested a TRO, a "temporary injunction," and a permanent injunction restraining FWWR for a

3

period of ten years from (1) "providing purported notice of cancellation of any agreements between PCI and FWWR"; (2) "refusing to deliver less than ten (10) PCI-bound railroad cars with cargo per day to PCI on its spur, to the extent such cars are available"; (3) "delivering cars to PCI's spur on any basis other than on the basis of delivery of those PCI-bound cars which have been in FWWR's possession the most number of days"; and (4) "imposing or attempting to impose any demurrage charges upon PCI, or in the alternative, imposing or attempting to impose any demurrage charges upon PCI when timely delivery of PCI's cars on a first-in, first-out basis would have resulted in no demurrage charges, and in those situations where no demurrage charges would accrue but for FWWR's service failures".  The state court granted PCI's request for a TRO.

FWWR then removed the case to federal court, asserting that PCI's state law claims were completely preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA").[2]  The ICCTA overhauled the Interstate Commerce Act ("ICA"), including the elimination of the Interstate Commerce Commission and replacing it with the Surface Transportation Board ("STB").  PCI filed a motion for remand, arguing that the suit was outside the ambit of the ICCTA.  The district court denied PCI's motion, concluding that removal was proper under the doctrine of complete preemption.

_____

[2] 49 U.S.C. §§ 10101, et. seq.

4

PCI filed a request for a temporary injunction and hearing in the district court, seeking essentially the same relief that it had sought in state court. This was PCI's second motion for injunctive relief. Its first motion was denied for procedural reasons. The district court denied PCI's motion without a hearing, holding that, as a result of PCI's failure to proffer into evidence the contract on which it based its claims for relief, it had not demonstrated, prima facie, that the district court, as distinguished from the STB, had jurisdiction to entertain PCI's requested injunctive relief. The district court also held that PCI failed to demonstrate that it would suffer irreparable injury absent an injunction. PCI appeals the district court's denial of its remand motion, denial of its motion for a preliminary injunction, and refusal to hold a hearing on the motion for a preliminary injunction.

## II. ANALYSIS

### A.    Appeal of the Remand Order

An order denying a motion to remand is not appealable as a final decision within the meaning of 28 U.S.C. § 1291; standing alone, such a ruling cannot be appealed unless certified by the district court under 28 U.S.C. § 1292(b).[3] PCI nevertheless contends that we have jurisdiction to consider its appeal of the

---

[3] Poirrier v. Nicklos Drilling Co., 648 F.2d 1063, 1064-65 (5th Cir. 1981); Lewis v. E.I. Du Pont De Nemours & Co., 183 F.2d 29, 31 (5th Cir. 1950).

remand order, citing the Ninth Circuit's decision in O'Halloran v. University of Washington.[4]  The court in O'Halloran held that an appeal from an order denying a motion to remand is reviewable prior to final judgment when joined with an interlocutory appeal from an order granting or denying an injunction.[5]

Several other circuits have held the same, either expressly or implicitly.[6]  We have not previously addressed the question whether the denial of a remand order becomes reviewable when it is coupled with an interlocutory appeal of an injunction order under 28 U.S.C. 1292(a)(1).  We did conclude in Texas v. Real Parties in Interest, however, that the denial of a remand order can be reviewed in conjunction with the interlocutory appeal of an order denying a claim of Eleventh Amendment immunity, the latter order being appealable under the collateral order doctrine.[7]  In deciding that

---

[4] 856 F.2d 1375 (9th Cir. 1988).

[5] Id. at 1378.

[6] See James v. Bellotti, 733 F.2d 989, 992 (1st Cir. 1984) ("The denial of an injunction is an appealable interlocutory order under 28 U.S.C. § 1292(a)(1), and the refusal to remand to the state court, though not directly appealable by itself, is reviewable in conjunction with the interlocutory appeal."); Beech-Nut, Inc. v. Warner-Lambert Co., 480 F.2d 801, 803 (2d Cir. 1973) (considering interlocutory appeal of denial of remand order along with denial of injunctive relief without discussion of why consideration of remand was proper); Kysor Indus. Corp. v. Pet, Inc., 459 F.2d 1010, 1011 (6th Cir. 1972) (holding that because the case was properly before the court on interlocutory appeal of the denial of a motion for a preliminary injunction, and the remand issue was jurisdictional, the remand issue must be reached).

[7] 259 F.3d 387, 391 (5th Cir. 2001).

we could consider the order denying remand, we looked solely to whether the Eleventh Amendment immunity issue was non-frivolous and properly before us on appeal.[8]  Implicit in that decision is the conclusion that, once <u>appellate</u> jurisdiction has been established, we are compelled to address questions of <u>federal</u> jurisdiction.

In the context of the collateral order doctrine, we perceive no difference in the distinction between Eleventh Amendment immunity and remand.  We thus conclude that PCI's appeal of the denial of its motion for a preliminary injunction is both non-frivolous and properly before us.  Consonant with our holding in <u>Real Parties in Interest</u>, we first consider the jurisdictional question whether the district court erred in denying PCI's motion to remand the case to state court.

**B.   Removal and Remand**

The district court denied PCI's motion to remand the case, relying primarily on (1) the Northern District of Iowa's reasoning in  <u>Cedarapids, Inc. v. Chicago, Central & Pacific Railroad Co.</u>[9] and (2) § 10501 of the ICCTA.  Section 10501 provides:

> (b) The jurisdiction of the Board over--
>
> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

---

[8] <u>Id.</u>

[9] 265 F. Supp.2d 1005 (N.D. Iowa 2003).

7

> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.[10]

PCI contends that removal was improper because the relief that PCI requests is expressly excluded from the reach of the ICCTA by § 10709 of that act. "We exercise plenary, de novo review of a district court's assumption of subject matter jurisdiction."[11]

### 1.  PCI's § 10709 Argument

FWWR establishes rates for its transportation services, as well as rules and practices related to those services, including specifically the rules relating to the imposition of demurrage fees.[12]  The injunctive relief PCI seeks would regulate the operation of FWWR's switching yard and would therefore fall squarely under § 10501(b).  PCI argues nonetheless that its dispute with FWWR is purely over FWWR's compliance with the contract, and that, under 49 U.S.C. § 10709, such contracts are not subject to

---

[10] 49 U.S.C. § 10501.

[11] Hoskins v. Bekins Van Lines, 343 F.3d 769, 772 (5th Cir. 2003).

[12] 49 U.S.C. § 10701.

8

the ICCTA and thus not under the jurisdiction of the STB. Section

10709 provides in relevant part:

> (a) One or more rail carriers providing transportation subject to the jurisdiction of the Board under this part may enter into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions.
>
> (b) A party to a contract entered into under this section shall have no duty in connection with services provided under such contract other than those duties specified by the terms of the contract.
>
> (c)(1) A contract that is authorized by this section, and transportation under such contract, shall not be subject to this part, and may not be subsequently challenged before the Board or in any court on the grounds that such contract violates a provision of this part.
>
> (2) The exclusive remedy for any alleged breach of a contract entered into under this section shall be an action in an appropriate State court or United States district court, unless the parties otherwise agree.

None disputes that FWWR is a rail carrier and PCI is a purchaser of its services.[13]

PCI's position on the applicability of § 10709 can be distilled to two arguments. First, PCI argues that the STB has no jurisdiction to hear claims even related to agreements governed by § 10709, citing the language of the statute and decisions of the

---

[13] "'[R]ail carrier' means a person providing common carrier railroad transportation for compensation," 49 U.S.C. § 10102(5), and a "railroad" includes a "switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation." § 10102(6)(C).

9

STB refusing to consider such disputes.[14]  We see nothing in the statutory language that supports PCI's "related to" argument, however, and PCI fails to direct us to any such language.  In fact, § 10709(b) specifies that a party entering into such a contract has only "those duties specified by the terms of the contract."  The decisions of the STB cited by PCI also fail to support its argument.  <u>H.B. Fuller Co. v. Southern Pacific Transportation Co.</u>[15] is inapposite because the contract at issue there was a comprehensive one that purported to govern the entire relationship between the litigants.  Fuller, a manufacturer, sued Southern Pacific, alleging that the railroad had imposed unreasonable storage and demurrage charges.  The transportation in question was subject to a "contract for carriage."  Fuller argued that its claims fell outside that contract and thus within the STB's jurisdiction, because the contract did not explicitly address demurrage or storage charges.  The STB rejected Fuller's argument and held that the claims fell outside its jurisdiction.  Although the contract did not explicitly address those areas, it did incorporate by reference the "tariffs, rules and regulations which would apply" if there was no contract to govern those areas not covered by the contract.  Therefore, held the STB, the referenced

---

[14] Reply Brief at 6.  PCI did discuss the STB cases in its initial brief, but appears to have asserted the "even related to" argument for the first time on reply.

[15] STB Docket No. 41510 (Aug. 20, 1997).

10

tariff terms became part of the contract. The other two STB decisions that PCI cites add nothing to the analysis.[16]

In <u>Cross Oil Refining & Marketing, Inc. v. Union Pacific Railroad Co</u>,[17] a decision not cited by PCI, the STB considered whether a series of purported contracts were the kind governed by § 10709. Cross Oil argued that § 10709 did not apply because, under the agreements in question, service and equipment were to be provided on the same basis as those provided to other shippers. The STB rejected Cross Oil's argument, ruling that the transportation at issue was provided under the contracts: Each contract affirmatively stated that it was made pursuant to § 10709, identified the origins and destinations, and specified the terms of the contract and the rates for the commodities. As in <u>Fuller</u>, the STB held that rail contracts can incorporate tariff provisions by reference yet still fall outside the STB's jurisdiction.

Unlike the agreements at issue in the cited cases, the contract in the instant case is very limited in scope, and does not incorporate any tariff provisions. As such, any relief requested

---

[16] <u>Minn. Power Inc. v. Duluth, Missabe and Iron Range Ry. Co.</u>, STB Docket No. 42038 (July 7, 1999), merely states that movement governed by a rail transportation contract is "beyond our regulatory purview under 49 U.S.C. 10709(c)" without providing any further analysis. <u>Parrish & Heimbecker, Inc.</u>, STB Docket No. 42031 (May 22, 2000), discusses the Staggers Act, stating only that the statute removed contract service from the authority of the ICC (predecessor to the STB).

[17] STB Finance Docket No. 33582 (Oct. 19, 1998).

11

by PCI that falls outside of the contract's express coverage is not governed by § 10709.

The second argument made by PCI is that all <u>relief</u> requested is within the contract's coverage and therefore within the reach of § 10709. In its reply to FWWR's response to PCI's motion to remand, PCI contended in district court that even if the contract does not specifically address (1) whether FWWR was required to place cars at PCI's spur on a FIFO basis, or (2) whether FWWR is required to place a "full spot" of ten cars at PCI's spur each day, the consistent conduct of the parties under the contract constitutes their agreed interpretation, causing those requirements to be incorporated into the contract. On appeal, PCI no longer asserts that the parties' prior conduct interpreted or supplemented the contract, arguing instead that all requested relief is within the language of the contract, namely that the parties' prior conduct, as well as the Texas railroad industry's customs and practices, inform what the term "switch" means. PCI relies primarily on the deposition testimony of Charley Godsey, the operations manager for FWWR, to establish that the term "switch" encompasses the portion of injunctive relief that FWWR insists falls outside of the contract. FWWR counters that the "switch" language in the contract was solely meant to change the number of days per week that switching services would be provided to PCI, but does not provide an alternative definition of "switch."

12

Under Texas law, the primary concern of a court construing a contract is to "ascertain the true intent of the parties as expressed in the instrument."[18] Even when there is neither patent nor latent ambiguity in the wording of a contract, "[e]xtrinsic evidence may, indeed, be admissible to give the words of a contract a meaning consistent with that to which they are reasonably susceptible."[19] "A specialized industry term may require extrinsic evidence of the commonly understood meaning of that term within the specialized industry."[20] PCI provides a string of citations to the Godsey deposition to support its definition of "switch". A review of the cited portions of the record reveals, however, that Godsey was never asked to explain or define the meaning of providing a "switch." His deposition lays out how FWWR deals with customers and states that FWWR (1) does not impose demurrage charges when the mistakes are its own, (2) uses a FIFO method to determine which cars to deliver, and (3) will fill the spot available on a customer's spur each day. None of this, however, is ever tied by the deposition to the meaning of providing a "switch."

---

[18] Dell Computer Corp. v. Rodriguez, 390 F.3d 377, 388 (5th Cir. 2004); Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency, Inc., 56 S.W.3d 313, 319 (Tex. App. – Houston [1st Dist.] 2001, pet. denied).

[19] Nat'l Union Fire Ins. Co. v. CBI Indus. Inc., 907 S.W.2d 517, 521 (Tex. 1995).

[20] Royal Maccabees Life Ins. Co. v. James, 146 S.W.3d 340, 345-46 (Tex. App. – Dallas 2004, pet. filed).

Even if we were to accept PCI's broad definition of "switch," the injunctive relief it seeks is still broader than that which the contract governed.  The last portion of PCI's request seeks to control FWWR's ability to impose demurrage charges under any circumstances, or in the alternative, any circumstance in which no demurrage charges would accrue but for FWWR's service failures, not just those situations in which FWWR fails either to provide a full spot of cars or to deliver the cars on a FIFO basis.  We hold that, at the very least, a portion of FWWR's claims are governed by the ICCTA.

## 2.    Complete Preemption

For the district court to have removal jurisdiction, 28 U.S.C. § 1441 requires that "the case be one over 'which the district courts of the United States have original jurisdiction.'"[21] Whether a claim arises under federal law is a question determined by reference to the plaintiff's "well-pleaded complaint."[22]  As a defendant may remove a case only if the claims could have been brought in federal court, "the question for removal jurisdiction must also be determined by reference to the 'well-pleaded complaint.'"[23]  "Under the well-pleaded complaint rule, 'federal

---

[21] <u>Johnson v. Baylor Univ.</u>, 214 F.3d 630, 632 (5th Cir. 2000) (citation omitted).

[22] <u>Hoskins</u>, 343 F.3d at 772 (citing <u>Louisville & Nashville R. Co. v. Mottley</u>, 211 U.S. 149, 152 (1908)).

[23] <u>Merrell Dow Pharm., Inc. v. Thompson</u>, 478 U.S. 804, 808 (1986).

14

jurisdiction exists only when a federal question is presented on the face of plaintiff's properly pleaded complaint.'"[24] "As a general rule, absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim."[25] <u>Potential defenses</u>, including a federal statute's preemptive effect, <u>do not provide a basis for removal</u>.[26]

In <u>Beneficial National Bank v. Anderson</u>, the Supreme Court recognized two exceptions to this last rule: (1) when Congress expressly provides for removal and (2) when a federal statute wholly displaces the state-law cause of action through complete preemption.[27] The latter exception is the one that is at issue in the instant case. As stated above, standard preemption does not provide a basis for removal. In contrast, complete preemption is jurisdictional in nature and, as such, "authorizes removal to federal court even if the complaint is artfully pleaded to include solely state law claims for relief or if the federal issue is initially raised solely as a defense."[28]

---

[24] <u>Hoskins</u>, 343 F.3d at 772 (quoting <u>Caterpillar Inc. v. Williams</u>, 482 U.S. 386, 392 (1987)).

[25] <u>Beneficial Nat'l Bank v. Anderson</u>, 539 U.S. 1, 6 (2003).

[26] <u>Id.</u> (citing <u>Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal.</u>, 463 U.S. 1 (1983))(emphasis added).

[27] <u>Id.</u> at 8.

[28] <u>Johnson</u>, 214 F.3d at 632 (citation omitted).

15

Prior to the decision in <u>Beneficial</u>, we considered complete preemption to be a narrow exception, noting that the Supreme Court had only recognized its existence in the areas of federal labor relations and the Employee Retirement Security Act of 1974 ("ERISA").[29]  Our pre-<u>Beneficial</u> test for complete preemption required the defendant to show that

> (1) the statute contains a civil enforcement provision that creates a cause of action that both replaces and protects the analogous area of state law; (2) there is a specific jurisdictional grant to the federal courts for enforcement of the right; and (3) there is a clear Congressional intent that claims brought under the federal law be removable.[30]

In <u>Hoskins</u>, however, we modified the test in response to the Supreme Court's <u>Beneficial</u> decision, in which the Court extended the doctrine of complete preemption to the National Bank Act.  It reasoned that because the National Bank Act provides the exclusive cause of action for claims of usury against a national bank, all such claims arise under federal law for purposes of federal jurisdiction.[31]  In light of the decision in <u>Beneficial</u>, we held in <u>Hoskins</u> that the proper focus of complete preemption analysis is on

---

[29] <u>Id.</u> (citing to <u>Avco Corp. v. Machinists</u>, 390 U.S. 557 (1968) and <u>Metro. Life Ins. Co. v. Taylor</u>, 481 U.S. 58 (1987)).

[30] <u>Id.</u>  The district court, in concluding there was complete preemption, neither applied our circuit's test nor looked to the Supreme Court's decision in <u>Beneficial</u>.

[31] <u>Beneficial Nat'l Bank</u>, 539 U.S. at 11.

16

whether Congress intended that the federal action be exclusive, as opposed to whether Congress intended that the claim be removable.[32]

In Hoskins, we considered whether there is complete preemption of claims asserted under the Carmack Amendment to the Interstate Commerce Act.[33] As there is neither language in the statute expressing Congress's intent that the Carmack Amendment provide the exclusive cause of action for claims arising out of the interstate transportation of goods by a common carrier nor any legislative history to be examined, we looked to our own cases and those of the Supreme Court to determine whether Congress did indeed intend for the Carmack Amendment to provide the exclusive cause of action, holding that it did.[34] In the instant case, the plain language of § 10501 supports our conclusion that Congress intended actions regarding "rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers"[35] to be governed exclusively by the ICCTA. The House Report on the proposed ICCTA

---

[32] Hoskins, 343 F.3d at 776. Our holding in Hoskins, reversing our prior holding that the Carmack Amendment did not support complete preemption, reflects Justice Scalia's conclusion that the majority's holding in Beneficial makes finding complete preemption easier than existed under Taylor. Beneficial Nat'l Bank, 539 U.S. at 16-19 (Scalia, J., dissenting).

[33] 49 U.S.C. § 14706. Section 14706 resides under the part of the ICA governing Motor Carriers. The Carmack Amendment also modified the Rail part of the ICA. 49 U.S.C. § 11706.

[34] Hoskins, 343 F.3d at 776.

[35] 49 U.S.C. § 10501(b)(1).

17

also supports the conclusion that the ICCTA provides the exclusive

cause of action:

> [Section 10501] replaces the railroad portion of former Section 10501.  Conforming changes are made to reflect the direct and complete pre-emption of State economic regulation of railroads.  The changes include extending exclusive Federal jurisdiction to matters relating to spur, industrial, team, switching or side tracks formerly reserved for State jurisdiction under former section 10907.  The former disclaimer regarding residual State police powers is eliminated as unnecessary, in view of the Federal policy of occupying the entire field of economic regulation of the interstate rail transportation system.  Although States retain the police powers reserved by the Constitution, the Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive.[36]

In light of the plain language of the statute and its legislative

history, and in accordance with our holding in Hoskins, we hold

that the complete preemption doctrine applies.  And, as the ICCTA

provides the exclusive cause of action for PCI's non-contractual

relief, we hold that those claims "'only arise[] under federal law

and could, therefore, be removed under § 1441.'"[37]  The district

court's denial of remand was thus appropriate.

C.   PCI's Preliminary Injunction Request

---

[36] H.R. REP. No. 104-311, at 95-96 (1995).  The Conference Report emphasized that the conference version of the bill was meant to preserve the exclusivity of federal remedies in the area of rail regulation that existed prior to the passage of the ICCTA.  H.R. CONF. REP. No. 104-422, at 167.

[37] Hoskins, 343 F.3d at 778 (quoting Beneficial, 539 U.S. at 11).

We review the denial of a preliminary injunction for abuse of discretion.[38] "Even though 'the ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion, a decision grounded in erroneous legal principles is reviewed de novo.'"[39]

To obtain a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) that his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest.[40] "We have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements."[41]

PCI fails to establish that there is a substantial likelihood that it will prevail on the merits. As the district court noted in its denial of the injunction, PCI never submitted the contract to the court for it to review. Without the contract, the district

---

[38] Lake Charles Diesel, Inc. v. Gen. Motors Corp., 328 F.3d 192, 195 (5th Cir. 2003).

[39] Id. (quoting Women's Med. Ctr. v. Bell, 248 F.3d 411, 419 (5th Cir. 2001)).

[40] Id. at 195-96.

[41] Id. at 196 (quoting Miss. Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618, 621 (5th Cir. 1985)).

court could not possibly evaluate whether PCI was likely to prevail on the merits. In addition, PCI fails to show that it would suffer irreparable injury if an injunction were not granted. PCI's doom-and-gloom prediction that without an injunction it would lose the use of the track and be forced out of business is not borne out by the record and the briefs. The only consequence of contract cancellation appears to be a reversion to the terms and conditions provided by the federal tariff that governs such operations. Any damage resulting from a shorter period before demurrage is charged can be compensated for monetarily.[42] We hold that there was no abuse of discretion by the district court in denying the injunction sought by PCI.

## D. Failure to Conduct a Hearing

PCI makes the additional argument that the district court erred in failing to conduct a hearing before denying its motion for a preliminary injunction. Federal Rule of Civil Procedure 65(a)(1) specifies that "[n]o preliminary injunction shall be issued without notice to the adverse party." "We have interpreted the notice requirement of Rule 65(a)(1) to mean that 'where factual disputes are presented, the parties must be given a fair opportunity and a

---

[42] See Morgan v. Fletcher, 518 F.2d 236, 240 (5th Cir. 1975) (citations and quotations omitted) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weights heavily against a claim of irreparable harm.").

meaningful hearing to present their differing versions of those facts before a preliminary injunction may be granted.'"[43]

PCI relies on our decision in Commerce Park as support for its contention that, before a preliminary injunction motion can be denied, a hearing must be held. In Commerce Park, however, we merely assumed for the purpose of our analysis that Rule 65 required that a hearing be held prior to the denial of a motion for a preliminary injunction.[44] The plaintiff has the burden of introducing sufficient evidence to justify the grant of a preliminary injunction.[45] PCI's motion for a preliminary injunction was predicated on the breach of a contract that was never put before the district court. PCI also failed to adduce any probative evidence that it would suffer irreparable injury in the absence of an injunction; its only factual offering was the conclusional statement that the demurrage charges would be too costly for it to remain in business. PCI's failure to introduce the contract into evidence and its failure to establish the existence of a factual

---

[43] Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 628 (5th Cir. 1996) (quoting Commerce Park at DFW Freeport v. Mardian Constr. Co., 729 F.2d 334, 342 (5th Cir. 1984)).

[44] Commerce Park, 729 F.2d at 341.

[45] Canal Auth. of the State of Florida v. Callaway, 489 F.2d 567, 578-79 (5th Cir. 1974).

21

dispute on the question whether it would suffer irreparable injury made a hearing unnecessary.[46]

The district court's orders denying PCI's motion for remand and denying PCI's motion for a preliminary injunction —— including its refusal to conduct a hearing —— are, in all respects, AFFIRMED.

---

[46] <u>Kaepa, Inc.</u>, 76 F.3d at 628 ("If no factual dispute is involved . . . no oral hearing is required.").