John A. RIGAS; Carrie J. Rigas, Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant–Appellee.

No. 11–20360.

United States Court of Appeals, Fifth Circuit.

Aug. 21, 2012.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Marcus J. Brooks, Joe Anthony Rivera, Esq., Naman, Howell, Smith & Lee, P.L.L.C., Steven Gregory White, Esq., Waco, TX, for Plaintiffs–Appellants.

Bethany Buck Hauser, Esq., Tamara W. Ashford, Esq., Deputy Assistant Attorney General, Bridget Maria Rowan, U.S. Department of Justice, Washington, DC, Christopher R. Egan, U.S. Department of Justice, Dallas, TX, for Defendant–Appellee.

Before REAVLEY, PRADO, and OWEN, Circuit Judges.

PER CURIAM: *

John A. Rigas and his wife, Carrie J. Rigas, (the Rigases) appeal the district court's grant of summary judgment in fa-

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

vor of the Government in their tax-refund lawsuit. We affirm the district court's dismissal of their suit. The district court only had jurisdiction to hear their claim that the IRS's payment of refunds to their fellow partners constituted a settlement to which they were entitled to consistent treatment, and with respect to this claim, the Government was entitled to summary judgment.

## I

This tax-refund lawsuit focuses on the business relationship between Hydrocarbon Capital, LLC (Hydrocarbon) and Odyssey Energy Capital I, LP (Odyssey) and their IRS filings for the 2004 tax year. The relevant history begins with Hydrocarbon's acquisition of a portfolio of oil and gas assets from Mirant Corporation (Mirant). Hydrocarbon's principals asked five former employees of Mirant—David Stewart, Kelly Plato, Harold Abels, Robert Loving, and John Rigas—to manage, develop, and sell the portfolio of assets. To do so, these individuals formed Odyssey. Each individual became a limited partner, and the general partner was Odyssey Energy Capital, LLC, which was formed by the same five individuals.

Odyssey and Hydrocarbon executed a Loan Management and Servicing Agreement (the Agreement), which defined their relationship. Odyssey was "to provide servicing, management, administration and disposition services" with respect to Hydrocarbon's newly acquired portfolio of assets. The parties acknowledged that Hydrocarbon would "retain title, ownership and exclusive control of the Assets," and Article 18.1 provided:

*No Partnership Intended.* Nothing in this agreement shall be deemed or construed to create a partnership or joint venture between or among any of the parties hereto nor shall [Odyssey] be deemed to be the general partner of [Hydrocarbon]. It is specifically acknowledged and agreed that, in performing its duties and obligations hereunder, [Odyssey] is acting solely in the capacity as an independent contractor for, and an agent of, [Hydrocarbon].

Odyssey's overhead expenses were funded through a $6 million nonrecourse Promissory Note executed by Odyssey in favor of Hydrocarbon. Semiannually, Odyssey would submit a budget for overhead expenses to Hydrocarbon for review and approval, and Odyssey would make draw downs against the note from time to time.

In 2004, the portfolio's assets were sold for $288 million, and Hydrocarbon's gain was approximately $110 million. Per the Agreement, Odyssey was paid a "Performance Fee" of approximately $20 million. The Agreement states that the Performance Fee is "compensation for performing the duties and rendering the services" under the Agreement. The Performance Fee was due only after Hydrocarbon recovered its out-of-pocket expenses, its capital investment, a 10% return, and any payments due on the Promissory Note. What remained was to be split with 80% going to Hydrocarbon and 20% going to Odyssey. In 2005, Hydrocarbon collected $31,920 from Odyssey pursuant to a clawback provision in the Agreement. This provision permitted Hydrocarbon to demand payment from Odyssey following termination of the Agreement if the Performance Fee had been paid but Hydrocarbon had not fully recovered the amounts it was due before payment of the Performance Fee.

On Odyssey's original 2004 partnership return (Original Odyssey Return), filed on or about April 15, 2005, Odyssey reported the Performance Fee as ordinary income. Odyssey issued a Schedule K–1 to each of its partners, and John Rigas's Schedule K–

1 indicated that he had received approximately $4 million in ordinary income. The Rigases jointly filed a 2004 individual tax return reporting the money received as ordinary income in line with the Schedule K-1 (Original Rigas Return).

In 2007, Odyssey filed an amended partnership return for 2004 (Amended Odyssey Return). In it, Odyssey changed the characterization of the Performance Fee to a net long-term capital gain acquired from the sale of "HYDROGEN CAPITAL." Odyssey attached an amended Schedule K-1 for each partner, and John Rigas's Schedule K-1 now indicated that the $4 million he had received was a net long-term capital gain.

What the IRS did with the Amended Odyssey Return is in dispute. The Rigases argue that the IRS approved the Amended Odyssey Return "and formally *adjusted* Odyssey's income from ordinary income to capital gain income." They rely on the deposition testimony of Sharletha Swain, an IRS employee who handled the Amended Odyssey Return, in which she stated that she processed the return, made an adjustment, and closed it out. This, she said, meant that it had been accepted. The Government asserts that documents produced in discovery establish that "there was no examination or partnership proceeding or indeed any substantive review at all." It argues that the change in the characterization of the $20 million on the form signed by Swain "was, essentially, ministerial."

Based on the change reflected in the Amended Odyssey Return, on or about April 23, 2007, the Rigases filed an amended tax return for 2004 (First Amended Rigas Return) in which they requested a refund of $857,682. They included the following explanation: "Taxpayers received amended K-1s from Odyssey Energy Capital I LP and from Odyssey Energy Capital LLC after their original return was filed. This amended return reflects the amended information." The Rigases included copies of the Schedule K-1s from the Odyssey companies. The IRS received this return on May 29, 2007, and in August, returned it with a letter requesting a "completed Form 1040X to support the changes you have made" and a "completed copy of Part II, page 2, Form 1040X." The IRS's letter stated:

> We need to know what items of income, deductions, or credits you changed, the amount of each change, and the reasons for the changes....

> The amended Schedule K-1 did not explain the tax decrease nor the increase to adjusted gross income and taxable income. Please send us the information to explain the decreases as shown on Lines 6 and 9 of your Form 1040X.

The Rigases' accountant responded a few days later by sending the IRS a full copy of the Original Rigas Return, the First Amended Rigas Return, and the original and amended Schedule K-1s from both Odyssey companies. In an accompanying letter, he indicated that "long-term capital gains changed from a loss of $3,000 to a gain of $4,448,657" and "Passive Income and Loss changed from income of $4,222,999 to a gain of $3,394." In October, the IRS sent a second letter, which again requested a "completed Form 1040 to support the changes you have made." The Rigases' accountant responded to this letter by directing the IRS to his previous response. In a letter dated November 26, 2007, the IRS disallowed the Rigases' refund claim. The IRS explained that it was unable to allow the claim "because the amended return has not yet been processed for the entity shown on Schedule E and Schedule D," and it noted that the claim could be refiled after the processing of that amended return.

The Rigases' refiled in February 2008 (Second Amended Rigas Return). On this return, the explanation stated:

> Taxpayers received amended K–1s from Odyssey Energy Capital I LP and from Odyssey Energy Capital LLC after their original return was filed. This amended return reflects the amended information. All documentation to support the calculations is enclosed. The information includes the amended K–1s and the effected [sic] forms and schedules which include Form 1040 pages 1 and 2, Forms 4797, 6251, and 8582 and Schedules D, E and SE.

The IRS selected this return for examination and assigned IRS agent Michael Glass to conduct the examination. During his investigation, he discovered that "[four] other claims from the same partnership had previously been paid." The other four limited partners in Odyssey had all already been paid refunds. On October 6, 2009, while the Rigases' claim was being examined, the Rigases filed a Notice of Inconsistent Treatment or Administrative Adjustment Request (Form 8082). Eventually, the IRS concluded that "all income received under the [Agreement] [was] compensation for services rendered, and therefore ordinary income," and the Rigases' claim was "disallowed in full."

On November 20, 2009, the Rigases filed suit seeking a refund under 28 U.S.C. § 1346(a)(1) and 26 U.S.C. §§ 7422 and 6228(b). After discovery, the parties filed cross-motions for summary judgment. The district court granted the Government's motion and denied the Rigases' motion, and the Rigases appealed.

## II

We first address the Government's argument that the district court lacked jurisdiction to hear the Rigases' claims. We review the district court's assumption of subject matter jurisdiction de novo.[1] The Rigases, as the party asserting jurisdiction, bear the burden of proof.[2]

Although 28 U.S.C. § 1346(a)(1) grants the district courts jurisdiction over civil actions against the United States that seek a refund, because Odyssey is a partnership subject to the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), 26 U.S.C. § 7422(h) must also be considered. Section 7422(h) creates a special jurisdictional rule: "No action may be brought for a refund attributable to partnership items ... except as provided in section 6228(b) or 6230(c)." This jurisdictional rule exists to ensure that partnership items are determined at the partnership level.[3] The § 6228(b) exception to § 7422(h) permits a civil action to be brought for a refund attributable to partnership items if the Secretary of the Treasury responds to a partner's request for an administrative adjustment of partnership items (Administrative Adjustment Request (AAR)) pursuant to 26 U.S.C. § 6227(d) by mailing notice that the partnership items will be treated as nonpartnership items or if the Secretary fails to allow any part of such an AAR

---

**1.** *Arena v. Graybar Elec. Co.,* 669 F.3d 214, 218–19 (5th Cir.2012) (citing *PCI Transp. v. Fort Worth & W. R.R. Co.,* 418 F.3d 535, 540 (5th Cir.2005)).

**2.** *Id.* at 219 (citing *Howery v. Allstate Ins. Co.,* 243 F.3d 912, 919 (5th Cir.2001)).

**3.** *See* 26 U.S.C. §§ 6221, 6231(a)(3) (defining a partnership item and mandating that, except as otherwise provided, the tax treatment of a partnership item is to be determined at the partnership level); *see also id.* § 6222(a) (mandating that partners, on their own returns, "treat a partnership item in a manner which is consistent with the treatment of such partnership item on the partnership return").

and no such notice was mailed.[4] The § 6230(c) exception to § 7422(h) applies to claims arising from erroneous computations.[5]

■ In their complaint, the Rigases asserted that the district court had jurisdiction pursuant to 28 U.S.C. § 1346(a)(1) and 26 U.S.C. §§ 7422 and 6228(b), and on appeal, they explain that their lawsuit raises two types of claims: (1) a substantive, nonpartnership claim that the payment from Hydrocarbon should have been taxed as capital gains, and (2) a procedural claim that TEFRA entitles them to consistent treatment with Odyssey and the other Odyssey partners. They argue that the district court had jurisdiction over their nonpartnership claim pursuant to §§ 7422(h) and 6228(b) and that their consistent-treatment claim is properly viewed as an individual claim such that they need not satisfy the requirements of § 7422(h). In their appellate briefs, the Rigases do not argue that the district court had jurisdiction pursuant to the § 6230(c) exception to § 7422(h), and in a footnote they appear to disclaim the applicability of § 6230(c). In their reply brief, the Rigases briefly assert that the Government waived any objection to deficiencies in form by examining their claim in full and that they perfected any deficiency while the IRS was evaluating their claim, but we consider these arguments to be waived due to inadequate briefing because the Rigases attempt to incorporate their arguments before the district court by reference without citing any supporting authorities in their appellate brief.[6]

The district court determined that it had jurisdiction based on §§ 7422(h) and 6228(b). In making this determination, the district court concluded that the Second Amended Rigas Return—the only form submitted within the period for filing a petition under § 6228(b) [7]—substantially complied with the regulatory requirements for an AAR under 26 U.S.C. § 6227(d). The Government argues that the district court erred when it concluded that the Second Amended Rigas Return substantially complied with the requirements for a § 6227(d) AAR and that the Rigases' consistent-treatment claim is attributable to partnership items and subject to § 7422(h).

**A**

While § 6228(b) may be satisfied in two ways, only the second is potentially applicable here.[8] As explained, for this second avenue under § 6228(b) to apply, the Secretary must fail to allow any part of an AAR filed pursuant to § 6227(d), and the Secretary must not have mailed notice that the partnership items would be treated as nonpartnership items.[9] This necessarily requires the filing of an AAR pursuant to § 6227(d). Based on the timing requirements of § 6228(b)(2), the district court determined that only the Second Amended Rigas Return should be analyzed to determine if the Rigases filed an AAR pursuant to § 6227(d).[10] Both the Rigases' Form 8082 and the First Amended Rigas Return fell outside the appropriate time period: the Rigases' Form 8082 was filed only two

---

4. *See id.* § 6228(b).

5. *See id.* § 6230(c).

6. *See Swindle v. Livingston Parish Sch. Bd.,* 655 F.3d 386, 392 & n. 6 (5th Cir.2011); *Turner v. Quarterman,* 481 F.3d 292, 295 n. 1 (5th Cir.2007).

7. *See* 26 U.S.C. § 6228(b)(2)(B).

8. *See id.* § 6228(b)(1), (2)(A).

9. *See id.* § 6228(b)(2)(A).

10. *See id.* § 6228(b)(2)(B).

months prior to the filing of this lawsuit,[11] and the First Amended Rigas Return was filed more than two years prior to the filing of this lawsuit.[12] Applying the doctrine of substantial compliance, the district court concluded that the Second Amended Rigas Return qualified as an AAR, but the Government argues that the requirements for showing substantial compliance are not satisfied.

Although the Rigases assert that we may not consider the issue of substantial compliance because the Government did not file a cross-appeal, the issue is properly before us. The Government was successful before the district court—the district court granted its motion for summary judgment and dismissed the Rigases' claims with prejudice—and the Government is entitled to "sustain its judgment on any ground that finds support in the record."[13] The Government is not seeking to enlarge its own rights or to lessen the Rigases' rights.[14]

■ Our prior decisions recognize and apply the doctrine of substantial compliance, but they do not provide much guidance as to how the issue should be resolved as it is presented in this case. In fact, a number of our decisions addressing substantial compliance provide little help at all because they involve a taxpayer's election to use special-use valuation for estate-tax purposes. In this estate-tax context, substantial compliance is "a term of art in [former 26 U.S.C.] § 2032A(d)(3),"[15] and its interpretation and application relies heavily on the specific statutory text, legislative history, and congressional purpose.[16] Outside of the estate-tax context, the best guidance from a precedential decision comes from *Young v. Commissioner.*[17] In *Young* we stated that "[a]lthough regulatory requirements that relate to the substance or essence of a statutory provision of the Internal Revenue Code must be strictly complied with, a line of cases from the United States Tax Court has established that 'substantial compliance with regulatory requirements may suffice when such requirements are procedural and when the essential statutory purposes have been fulfilled.' "[18] Unfortunately, this guidance is quite general, and it does not provide much assistance to us in resolving this case. We do, however, benefit from the Tax Court's decision in *Samueli v. Commissioner,* which we consider to be highly persuasive because, in rendering its decision, the Tax Court addressed the same issue that we now face.[19]

---

11. *See id.* § 6228(b)(2)(B)(i)(I).

12. *See id.* § 6228(b)(2)(B)(i)(II).

13. *Jaffke v. Dunham,* 352 U.S. 280, 281, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957) (per curiam); *see also Maryland Cas. Co. v. Integrity Ins. Co.,* 693 F.2d 506, 510 n. 3 (5th Cir.1982) (per curiam); *cf. Nw. Airlines, Inc. v. Cnty. of Kent, Mich.,* 510 U.S. 355, 364, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994) ("A prevailing party need not cross-petition to defend a judgment on any ground properly raised below, so long as that party seeks to preserve, and not to change, the judgment.").

14. *Cf. Nw. Airlines, Inc.,* 510 U.S. at 361–62, 114 S.Ct. 855 (declining to resolve the question of whether a private right of action was intended because no cross-petition for certio-

rari was filed and doing so would undo a portion of the judgment in favor of the petitioners).

15. *Estate of Hudgins v. Comm'r,* 57 F.3d 1393, 1396 (5th Cir.1995).

16. *See id.* at 1400–02; *Estate of McAlpine v. Comm'r,* 968 F.2d 459, 461–64 (5th Cir.1992).

17. 783 F.2d 1201 (5th Cir.1986).

18. *Id.* at 1205 (quoting *Am. Air Filter v. Comm'r,* 81 T.C. 709, 719, 1983 WL 14887 (1983)).

19. *See* 132 T.C. 336, 343 (2009) ("We now focus on whether the amended return here qualifies as a partner AAR.").

As indicated in *Young*, we must first determine if the regulatory requirements in question are procedural, rather than substantive, such that the doctrine of substantial compliance may be applied. Here, the regulatory requirements of concern are found at 26 C.F.R. § 301.6227(d)–1. Section 301.6227(d)–1 requires that a partner file an AAR "on the form prescribed by the Internal Revenue Service for that purpose in accordance with that form's instructions," that the filing be made in duplicate, and that the filing include certain information. We agree with the Tax Court and the district court that § 301.6227(d)–1's requirement to use a specific form—Form 8082 to be precise [20] —is a procedural, rather than a substantive, requirement because we see no indication that the use of Form 8082 relates to the "substance or essence" of 26 U.S.C. § 6227(d).[21] As for the regulation's other requirements, we believe that they do relate to the substance of § 6227(d). As the Tax Court noted in addressing Form 8082's requirement to provide a detailed explanation, these requirements must be satisfied so that the IRS "can properly carry out the function of section 6227(d) by deciding as to the AAR whether to allow or disallow the requested adjustments, or to start a partnership proceeding." [22]

■ Turning next to the question of whether the Second Amended Rigas Return substantially complied with the regulatory requirements, we draw heavily on the Tax Court's decision in *Samueli*. In *Samueli*, the Tax Court emphasized that the petitioners' amended return failed to substantially comply with the regulatory requirements because it was not filed with the service center where the partnership return was filed.[23] Additionally, the Tax Court relied upon the fact that the petitioners' amended return "did not explain in detail the reasons for the requested adjustments" as required by Form 8082 and, therefore, the regulation as well.[24] The Second Amended Rigas Return suffers from these same deficiencies. First, the Rigases did not file their amended return with the service center where Odyssey's return had been filed. Second, the Second Amended Rigas return lacked a detailed explanation of the reasons for the requested adjustments. In fact, it included an explanatory statement nearly identical to the one found to be deficient in *Samueli*—both simply indicate that the amended return was filed to reflect information in amended K–1s.[25] As in *Samueli*, the explanation here is insufficient because "it did not detail the specific reasons for the requested adjustments," which are necessary for the IRS to "properly carry out the function of section 6227(d)." [26] Further indicating a lack of substantial compliance with the regulatory requirements is the fact that the Second Amended Rigas Re-

---

**20.** *See id.* at 342 ("The Commissioner has prescribed Form 8082, Notice of Inconsistent Treatment or Administrative Adjustment Request (AAR), as the form to be used by a partner requesting an administrative adjustment.").

**21.** *See id.* at 344 ("We agree with petitioners that their amended return, filed without a Form 8082, may be characterized as a partner AAR if it substantially complied with the requirements for a partner AAR.").

**22.** *Id.* at 346.

**23.** *Id.*

**24.** *Id.; see* 26 C.F.R. § 301.6227(d)–1(a) ("A request for an administrative adjustment on behalf of a partner shall be filed on the form prescribed by the Internal Revenue Service for that purpose *in accordance with that form's instructions.*" (emphasis added)).

**25.** *Samueli*, 132 T.C. at 338.

**26.** *Id.* at 346.

turn related to more than one partnership and to both partnership and nonpartnership items.[27]

Accordingly, we conclude that the Second Amended Rigas Return did not substantially comply with the regulatory requirements for an AAR. Instead of looking to the highly persuasive decision of the Tax Court in *Samueli* to determine if the Rigases substantially complied with the regulatory requirements, the district court relied upon language from *Estate of McAlpine v. Commissioner*,[28] which, as discussed previously, is not controlling because it involves a taxpayer's election to use special-use valuation for estate-tax purposes.[29] Because the Second Amended Rigas Return does not qualify as an AAR filed pursuant to 26 U.S.C. § 6227(d), jurisdiction to hear the Rigases' tax-refund lawsuit cannot be based upon the § 6228(b) exception to § 7422(h).[30]

**B**

Next, we consider whether the Rigases' consistent-treatment claim is properly viewed as an individual claim such that Rigases need not satisfy the jurisdictional requirements of 26 U.S.C. § 7422(h). The Rigases' consistent-treatment claim is based on two alternative theories. First, the "adjustment theory" asserts that the Performance Fee was recharacterized as capital gains at the partnership level, thus

entitling the Rigases to that same treatment on their individual tax return. Second, the "settlement theory" asserts that, by paying refunds to the other Odyssey partners, the IRS entered into a settlement with those partners, which entitles the Rigases to consistent treatment pursuant to 26 U.S.C. § 6224(c)(2). We conclude that the settlement theory is not attributable to partnership items, and thus it can be raised as an individual claim pursuant to 26 U.S.C. § 1346(a)(1). However, we conclude that the adjustment theory is attributable to partnership items, and thus it is subject to the jurisdictional requirements of 26 U.S.C. § 7422(h).

In accordance with § 7422(h), "[n]o action may be brought for a refund attributable to partnership items (as defined in section 6231(a)(3)) except as provided in section 6228(b) or section 6230(c)."[31] A partnership item is defined as:

> any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent regulations prescribed by the Secretary provide that, for the purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level.[32]

A nonpartnership item is simply defined as "an item which is (or is treated as) not a partnership item."[33]

---

27. *See* 26 C.F.R. § 301.6227(d)–1(a)(4)–(5) (prescribing that an AAR "[r]elate only to partnership items" and "[r]elate only to one partnership and one partnership taxable year").

28. *See Estate of McAlpine v. Comm'r*, 968 F.2d 459, 462 (5th Cir.1992) ("Without attempting to announce a rule applicable in all cases, we think substantial compliance is achieved where the regulatory requirement at issue is unclear and a reasonable taxpayer acting in good faith and exercising due diligence nevertheless fails to meet it.").

29. *See supra* notes 15–16 and accompanying text.

30. *See supra* notes 9–10 and accompanying text.

31. 26 U.S.C. § 7422(h).

32. *Id.* § 6231(a)(3).

33. *Id.* § 6231(a)(4).

The Rigases rely on *Monti v. United States*[34] and *Prochorenko v. United States*[35] to support their argument that their consistent-treatment claim is not attributable to partnership items and that, therefore, it can be raised as an individual claim. *Monti* and *Prochorenko* involved partners who alleged that they had been erroneously denied their right—pursuant to § 6224(c)(2)—to settlement terms consistent with the terms of a settlement between the IRS and another partner and held that a claim for a refund based on such a denial was not attributable to partnership items.[36] The *Monti* court noted that "the question of whether a particular partner has properly been offered and is entitled to consistent terms depends on facts specific to the partner and his or her dealings with the IRS" and reasoned that this did not fit § 6231(a)(3)'s definition of a partnership item.[37] The *Monti* court also noted that the right of individual partners to consistent settlement terms was not listed in the treasury regulation listing items more appropriately determined at the partnership level and that the right to consistent settlement terms appears in subtitle F of the IRS Code, as opposed to subtitle A, which is mentioned in the statutory definition of a partnership item.[38] The *Prochorenko* court relied upon essentially the same factors with the exception of the fact that the right to consistent settlement terms appears in subtitle F.[39]

■ We find the analytical approach taken in *Monti* and *Prochorenko* to be helpful, and we choose to follow a similar approach in analyzing whether the Rigases' settlement and adjustment theories are attributable to partnership items. Ultimately, we conclude that the Rigases' settlement theory is not attributable to partnership items, and thus it can be pursued as an individual claim without the need to satisfy the jurisdictional requirements of § 7422(h). First, we consider it important that the right to a settlement consistent with a settlement obtained by another partner is not listed in the treasury regulation listing items more appropriately determined at the partnership level because the statutory definition of a partnership item includes a reference to this regulation in defining the term.[40] Second, we also consider it important that the question of whether the Rigases are entitled to a settlement consistent with a settlement obtained by another partner "has no effect on and is not affected by the tax liability of the other ... partners" because this further indicates that this is not an item that is "more appropriately determined at the partnership level."[41] It is true that this case involves a question not present in *Monti* or *Prochorenko*—whether the other partners entered into a settlement with the IRS at all—but this can be decided at the partner level without any effect on the partnership or the other partners. Because we conclude, like the courts in *Monti* and *Prochorenko*, that this asserted right to consistent treatment is not a partnership item, we conclude that the Rigases' refund claim based on the settlement theo-

**34.** 223 F.3d 76 (2d Cir.2000).

**35.** 243 F.3d 1359 (Fed.Cir.2001).

**36.** *Prochorenko,* 243 F.3d at 1361–63; *Monti,* 223 F.3d at 82.

**37.** *Monti,* 223 F.3d at 82.

**38.** *Id.*

**39.** *See Prochorenko,* 243 F.3d at 1363.

**40.** 26 U.S.C. § 6231(a)(3); 26 C.F.R. § 301.6231(a)(3)–1.

**41.** *Prochorenko,* 243 F.3d at 1363; *see* 26 U.S.C. § 6231(a)(3).

ry is not attributable to partnership items, and therefore it is not subject to § 7422(h).

■] With respect to the adjustment theory, we conclude that it is attributable to partnership items and subject to § 7422(h). Most important to this determination is the fact that 26 C.F.R. § 301.6231(a)(3)–1(a)(1)(i) specifically identifies as partnership items the partnership aggregate and each partners's share of "[i]tems of income, gain, loss, deduction, or credit of the partnership." Accordingly, when the Rigases claim that the Performance Fee was recharacterized as capital gains instead of ordinary income at the partnership level and that they are entitled to a refund based on a similar characterization at the partner level, their claim is attributable to a partnership item—the characterization of the Performance Fee— and is subject to § 7422(h). This conclusion is supported by the fact that characterization of the Performance Fee at the partnership level affects both the partnership's tax reporting and that of the other partners. In *Weiner v. United States*, we undertook a similar analysis and reached the same conclusion, i.e., that the refund claim was attributable to partnership items.[42]

### III

■ Based on the preceding jurisdictional analysis, the only claim over which the district court had jurisdiction was the Rigases' consistent-treatment claim based on their settlement theory. Although jurisdiction exists to consider this claim, it must fail. As a matter of law, the Government's payment of refunds to the other Odyssey partners does not constitute a settlement agreement as that term is used

in 26 U.S.C. § 6224(c). Section 6224 is entitled "Participation in administrative proceedings; waivers; agreements," and it is apparent when this section is considered as a whole that the settlement agreements referenced in subsection (c) are made with individual partners after an administrative proceeding is initiated to resolve partnership-level items. There was no partnership-level administrative proceeding in this case. Furthermore, and more importantly, paying the refund claims of the other Odyssey partners did not resolve any dispute such that it could be considered a settlement. Because the refund claims were paid, no dispute ever arose between those partners and the IRS.

\*　　\*　　\*

For the foregoing reasons, we DISMISS for lack of jurisdiction all of the Rigases' claims with the exception of their settlement-theory consistent-treatment claim. As to this claim, we AFFIRM the district court's grant of summary judgment and dismissal of the claim based on the alternative grounds addressed in this opinion.

---

**42.** *See Weiner v. United States*, 389 F.3d 152, 156–58 (5th Cir.2004) (concluding that the statute of limitations that supported the refund claim was a partnership item because it

"affect[ed] the partnership as a whole," was "implicitly included" in the treasury regulations, and "deal[t] with facts specific to the partnership").