# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 25, 2008

Charles R. Fulbruge III
Clerk

No. 06-31142

NEW ORLEANS & GULF COAST RAILWAY COMPANY,

Plaintiff - Appellant,

v.

ANGEL MARINOVICH BARROIS; DARREN J BARROIS; BECKY HINGLE KALISZESKI; JASON C KALISZESKI; BRADY J MILLER; TRACY WINDHAM MILLER; BETTY ST GERMAIN NELSON; KEVIN A NELSON; JERRY J RAYBORN, SR; LAWRENCE JOSEPH TILLOTSON; PATRICIA LERILLE TILLOTSON; FURNITURE MART - REAL ESTATE HOLDINGS LLC; CAROL PLAISANCE GAINEY; LEONARD JOURDAN, JR; BRUCE KENNAIR; TAMMY L KENNAIR; ANN FROST KOEN; EARL HERMAN KOEN, JR; SANDRA R RABALIAS; MARTHA RIDDLE; WINNIE L SOULE; MARIE VERDIN SOULET; RENE SOULET; DAWN P TREADWAY; JOHN W TREADWAY; CARL STEVEN WOODALL; ROBIN MEYER WOODALL,

Defendants - Appellees.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before REAVLEY, SMITH, and GARZA, Circuit Judges.
EMILIO M. GARZA, Circuit Judge:

The plaintiff-appellant New Orleans & Gulf Coast Railway Company ("NOGCR" or the "Railroad") brought this action to prevent the defendants-appellees, a collection of Louisiana property owners (the "Landowners"), from installing or using private, at-grade railroad crossings, which the Railroad has not authorized, but which Louisiana state property law allegedly has. The

district court dismissed the case for lack of subject matter jurisdiction. We AFFIRM.

I

NOGCR is a short-line railroad company that operates in Louisiana. The Landowners are the owners of enclosed estates, a group of Louisiana property owners whose only access from their estates to any public road is blocked by the Railroad's tracks. This dispute involves the right of the Landowners to cross the Railroad's tracks to reach these public roads.

Article 689 of the Louisiana Civil Code permits the owner of an estate with no access to a public road to claim a right of passage over neighboring property to the nearest public road in exchange for indemnity. LA. CIV. CODE art. 689. With this Louisiana authority as background, the Landowners have built private, at-grade[1] railroad crossings of various types and quality over the Railroad's tracks.[2]

The Railroad seeks to regulate these private crossings and has attempted to require the Landowners to obtain Railroad-issued permits, at some cost, to construct and operate the crossings. According to the Railroad, these private crossings impose substantial burdens on the Railroad in terms of both cost and safety. The crossings supposedly make it more difficult and thus more costly for the Railroad to upgrade, maintain, and monitor its tracks. The Railroad claims that it has incurred expense in correcting and improving the substandard workmanship of some of these crossings and repairing damage to the tracks caused by these crossings. The crossings also allegedly make it difficult for the

---

[1] An "at-grade" crossing is a crossing at the level of the tracks, as opposed to, for example, a crossing via bridge or tunnel.

[2] In its complaint, NOGCR alleges that it assumed control of the railroad in 1999 and that, at that time, its 24 miles of tracks were burdened by over 270 private crossings. This lawsuit seeks relief against only a handful of those crossings, 12 total.

Railroad to comply with various federal regulations governing railroad operation and safety. In short, these private crossings increase the Railroad's operating costs, imposing what the Railroad characterizes in its complaint as "onerous economic requirements on NOGCR's railroad operations."

As a result, the Railroad brought this action in federal court seeking injunctive and declaratory relief either to prohibit or regulate these private crossings, which the Railroad allegedly has not permitted. In its complaint, the Railroad sought a permanent injunction ordering the Landowners to "cease and desist from their continuing trespass and intrusion upon its right-of-way and interference with railroad operations by use of unauthorized and substandard crossings." Further, as part of its prayer for relief, the Railroad sought to prohibit private railroad crossings "without [its] express written permission." The Railroad also sought a declaratory judgment that, in short, its right-of-way in the Railroad vis-à-vis Louisiana state law was superior to any claimed right of passage by the Landowners. Moreover, the Railroad sought a declaration that Louisiana Civil Code Article 689, the basis for the Landowners' claimed right of passage, was preempted by federal law, specifically the Interstate Commerce Commission Termination Act ("ICCTA"), the Federal Railroad Safety Act ("FRSA"), and the Commerce Clause.

Some time after the Railroad filed its declaratory judgment action, one of the defendants in the case, Jerry J. Rayborn, Sr., filed an action against the Railroad in Louisiana state court seeking a temporary restraining order, a preliminary injunction, and a permanent injunction to prevent the Railroad from interfering with the private railroad crossings located on Rayborn's property. The Louisiana state court granted a temporary restraining order that prevented the Railroad from barricading or removing Rayborn's two existing private crossings, which provided the Rayborn property with access to a public road. The order also required Rayborn to post a $2,500 bond. The Railroad removed

Rayborn's case to federal court, where the case was consolidated with the Railroad's declaratory judgment action, while the temporary restraining order remained in effect.

Before the district court, the Railroad asserted jurisdiction based both on the presence of a federal question and diversity, 28 U.S.C. §§ 1331 and 1332. Regarding federal question jurisdiction, the Railroad claimed that the case was one "arising under" the Constitution and laws of the United States because two federal statutes, the ICCTA and the FRSA, and the Constitution's Commerce Clause preempted the inconsistent Louisiana state law authorizing the railroad crossings. The district court rejected these claims, dismissing the Railroad's declaratory judgment action for lack of subject matter jurisdiction and, for the same reason, remanding the Rayborn action to the Louisiana state court.

The Railroad now appeals. The Railroad does not, however, appeal the district court's Commerce Clause or diversity jurisdiction rulings. Rather, the Railroad's appeal focuses on its claim that federal jurisdiction is proper under 28 U.S.C. § 1331 because it seeks injunctive relief based on a federal statute, because of the completely preemptive force of the ICCTA and the FRSA, and because the case otherwise presents a substantial federal question.


II

We review a district court's determination of subject matter jurisdiction de novo. PCI Transp., Inc. v. Forth Worth & W. R.R. Co., 418 F.3d 535, 540 (5th Cir. 2005) (quoting Hoskins v. Bekins Van Lines, 343 F.3d 769, 772 (5th Cir. 2003)). The district court "has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. 1981).

Jurisdictional findings of fact are reviewed for clear error. Krim v. pcOrder.com, Inc., 402 F.3d 489, 494 (5th Cir. 2005). The party seeking to assert federal jurisdiction, in this case the Railroad, has the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. See Howery v. Allstate Ins. Co., 243 F.3d 912, 919 (5th Cir. 2001); Paterson v. Weinberger, 644 F.2d 521, 523 (5th Cir. 1981).

However, pursuant to 28 U.S.C. § 1447(d), we lack jurisdiction to entertain an appeal of a district court's remand order when that order is based on, among other things, lack of subject matter jurisdiction. Things Remembered, Inc. v. Petrarca, 516 U.S. 124, 127–28 (1995); Schexnayder v. Entergy Louisiana, Inc., 394 F.3d 280, 283 (5th Cir. 2004); see also Thermtron Prods., Inc. v. Hermansdorfer, 423 U.S. 336, 351 (1976) ("[T]o prevent delay in the trial of remanded cases by protracted litigation of jurisdictional issues, Congress immunized from all forms of appellate review any remand order issued on the grounds specified in § 1447(c), whether or not that order might be deemed erroneous by an appellate court." (citation omitted)).

Therefore, under § 1447(d), we lack jurisdiction to consider the district court's remand order for lack of subject matter jurisdiction, and we DISMISS that portion of the appeal challenging the district court's decision to remand the Rayborn action to state court.

III

Turning to the declaratory judgment action, the Railroad presents four arguments why the district court erred in dismissing its case for lack of subject matter jurisdiction. First, the Railroad argues that federal question jurisdiction is established because it seeks injunctive relief against an allegedly preempted state law or regulation. Second, relying on the complete preemption doctrine, the Railroad argues that the ICCTA preempts any state law claim to a right of

passage over the Railroad's tracks, rendering such a claim either wholly federal or nothing at all. Third, the Railroad argues that the FRSA also completely preempts any state law claim to a right of passage. Fourth, the Railroad argues that a substantial and disputed federal question underlies its complaint, thus establishing federal question jurisdiction. We consider and reject each of these claims below.

## A

The Railroad first argues that federal question jurisdiction is established because it seeks declaratory and injunctive relief from state regulation on the ground that the state regulation is preempted by federal law.

The federal question statute, 28 U.S.C. § 1331, provides district courts with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." To determine whether a case is one "arising under" federal law for these purposes, we ordinarily apply the well-pleaded complaint rule. PCI Transp., 418 F.3d at 543; Hoskins, 343 F.3d at 772. Pursuant to the well-pleaded complaint rule:

> [W]hether a case is one arising under the Constitution or a law or treaty of the United States, in the sense of the jurisdictional statute, . . . must be determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose.

Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 10 (1983) (alterations in original) (quoting Taylor v. Anderson, 234 U.S. 74, 75–76 (1914)); Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 672 (1950). The well-pleaded complaint rule focuses on whether the plaintiff has affirmatively alleged a federal claim, thus providing a basis for federal jurisdiction; anticipated or potential defenses, including defenses based on federal preemption, do not provide a basis for federal question jurisdiction. PCI

Transp., 418 F.3d at 543 (citing Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 6 (2003)); see also Caterpillar Inc. v. Williams, 482 U.S. 386, 393 (1987) ("[I]t is now settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue.").

Where, as here, a plaintiff brings a declaratory judgment claim pursuant to 28 U.S.C. §§ 2201 and 2202, in applying the well-pleaded complaint rule we ask whether "if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question." Franchise Tax Bd., 463 U.S. at 19; TTEA v. Ysleta del Sur Pueblo, 181 F.3d 676, 681 (5th Cir. 1999). A plaintiff cannot evade the well-pleaded complaint rule by using the declaratory judgment remedy to recast what are in essence merely anticipated or potential federal defenses as affirmative claims for relief under federal law. See TTEA, 181 F.3d at 681 (stating that "an anticipatory federal defense is insufficient for federal jurisdiction") (citing Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149, 152 (1908)). "Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction. . . ." Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc., 344 U.S. 237, 248 (1952) (dictum).

In this case, the Railroad's declaratory judgment action seeks to resolve whether the Landowners may rely upon Louisiana state property law to establish a right, as enclosed estate owners, to construct and use private at-grade crossings over the Railroad's tracks. If the Landowners, the declaratory judgment defendants, brought coercive actions to claim a right of passage over the Railroad's tracks, such actions would arise exclusively under state law.

Although the Railroad also seeks a declaration that this state property law constitutes a form of preempted state regulation, this claim arises merely as an anticipatory federal defense to a state law cause of action, which is generally insufficient to establish federal question jurisdiction.

Nonetheless, the Railroad argues that jurisdiction is established based on Shaw v. Delta Air Lines, Inc., 463 U.S. 85 (1983). In Shaw, the Supreme Court explained:

> It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. See Ex parte Young, 209 U.S. 123, 160–162 (1908). A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.

Id. at 96 n.14. The Railroad argues that because it seeks injunctive relief from state regulation on preemption grounds, Shaw applies and federal jurisdiction is established.

Shaw, among the progeny of Ex parte Young, clearly establishes a federal right of action against "state officials" to enjoin the enforcement of preempted state regulations. This cause of action against state officials is an affirmative federal claim that can form the basis for federal jurisdiction. See, e.g., Planned Parenthood of Houston and Se. Tex. v. Sanchez, 403 F.3d 324, 331 (5th Cir. 2005) (suit against Texas state officials to enjoin the enforcement of allegedly preempted state abortion laws); Gillis v. Louisiana, 294 F.3d 755, 760 (5th Cir. 2002) (suit against Louisiana and Louisiana state officials to enjoin as preempted Louisiana's regulation of pilotage off the state's coastline). However, Shaw does not address whether a comparable right of action can be asserted exclusively against private parties in the absence of any allegation of state action.

On this issue, Professor Wright explains:

> On principle it should be held that the rule of these cases is confined to actions to which state officials are parties. The best explanation of Ex parte Young and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution and laws. . . . That implied right of action does not reach to a suit by one private party against another and it ought to be held that there is no federal jurisdiction of an action for a private party that federal law has preempted a duty he would otherwise owe to another private party.

13B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3566. In line with this understanding, the First Circuit has stated: "Jurisdiction over actions for declarations of pre-emption can logically only be asserted where a state official is the defendant." Colonial Penn Group, Inc. v. Colonial Deposit Co., 834 F.2d 229, 237 (1st Cir. 1987). Likewise, when confronted with a declaratory judgment action raising preemption issues and involving only private parties, the Second Circuit distinguished Shaw because "[the plaintiffs] have not sued state officials to enjoin them from enforcing an unconstitutional state law." Albradco, Inc. v. Bevona, 982 F.2d 82, 87 (2d Cir. 1992).

We agree with these authorities that the principle articulated in Shaw—that a plaintiff who seeks injunctive relief on preemption grounds necessarily presents a federal question—does not apply in a suit exclusively between private parties, in the absence of some showing of state action. Shaw reemphasized that an affirmative federal cause of action exists against state officials who interfere with federal rights, including where the state official seeks to enforce federally preempted state regulations. Shaw did not, however, establish a comparable right of action against private parties, nor did it eviscerate that aspect of the well-pleaded complaint rule providing that

anticipated or potential defenses, including defenses based on federal preemption, do not establish a basis for federal question jurisdiction.

Because the Railroad sought relief exclusively against private parties and because the Railroad's preemption claim arises as an anticipated or potential federal defense, the Railroad's argument that federal jurisdiction is established under Shaw fails.

B

The Railroad next argues that the ICCTA completely preempts the Louisiana statutory scheme for enclosed estate owners, which has allegedly authorized the Landowners' construction and use of these private, at-grade railroad crossings.

The complete preemption doctrine is an exception to the well-pleaded complaint rule. McAteer v. Silverleaf Resorts, Inc., 514 F.3d 411, 416 (5th Cir. 2008) (citing Beneficial Nat'l Bank, 539 U.S. at 8). Under the complete preemption doctrine, what otherwise appears as merely a state law claim is converted to a claim "arising under" federal law for jurisdictional purposes because "the federal statute 'so forcibly and completely displace[s] state law that the plaintiff's cause of action is either wholly federal or nothing at all.'" Hoskins, 343 F.3d at 773 (quoting Carpenter v. Wichita Falls Indep. Sch. Dist., 44 F.3d 362, 366 (5th Cir. 1995)). The question in complete preemption analysis is whether Congress intended the federal cause of action to be the exclusive cause of action for the particular claims asserted under state law. See PCI Transp., 418 F.3d at 544; Hoskins, 343 F.3d at 775–76. If Congress intended the federal cause of action to be exclusive, the state law cause of action is completely preempted, and federal jurisdiction exists.

The complete preemption doctrine must be distinguished from the concept of ordinary preemption. See Sullivan v. Am. Airlines, Inc., 424 F.3d 267, 272–73

(2d Cir. 2005) (distinguishing "complete preemption" from "defensive preemption" or "ordinary preemption"). "Complete preemption is a 'jurisdictional doctrine,' while ordinary preemption simply declares the primacy of federal law, regardless of the forum or the claim." Lontz v. Tharp, 413 F.3d 435, 440 (4th Cir. 2005); Johnson v. Baylor Univ., 214 F.3d 630, 632 (5th Cir. 2000) ("'Complete preemption,' which creates federal removal jurisdiction, differs from more common 'ordinary preemption' (also known as 'conflict preemption'), which does not."); see also Sullivan, 424 F.3d at 272 n.5 (suggesting that the term "jurisdictional preemption" would reflect more accurately the doctrine's theoretical underpinnings). As a general matter, complete preemption is less common and more extraordinary than defensive or ordinary preemption. See Sullivan, 424 F.3d at 272–73 ("Many federal statutes—far more than support complete preemption—will support a defendant's argument that because federal law preempts state law, the defendant cannot be held liable under state law.").

We have held that the complete preemption doctrine applies to state causes of action that "fall squarely" under 49 U.S.C. § 10501(b) of the ICCTA. See PCI Transp., 418 F.3d at 540, 545 (concluding that the ICCTA provided the exclusive cause of action for the plaintiff's non-contractual relief that effectively sought to regulate the operation of a short-line railroad's switching yard and therefore fell squarely under § 10501(b)). Section 10501(b) provides:

> (b) The jurisdiction of the Board over—
>
> > (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
> >
> > (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b).

The "Board" refers to the Surface Transportation Board ("STB"), 49 U.S.C. § 10102(1), which is the body authorized by Congress to administer the ICCTA. See Friberg v. Kansas City S. Ry. Co., 267 F.3d 439, 442 (5th Cir. 2001) (noting that with the ICCTA Congress abolished the Interstate Commerce Commission ("ICC") and replaced it with the STB to perform many of the regulatory functions previously performed by the ICC). "As the agency authorized by Congress to administer the [ICCTA], the Transportation Board is uniquely qualified to determine whether state law should be preempted by the [ICCTA]." Emerson v. Kansas City S. Ry. Co., 503 F.3d 1126, 1130 (10th Cir. 2007) (alterations in original) (quoting Green Mountain R.R. Corp. v. Vermont, 404 F.3d 638, 642 (2d Cir. 2005)).

Although PCI Transportation applied the complete preemption doctrine to an asserted state remedy that fell "squarely" under § 10501(b) of the ICCTA, that decision focused on whether the complete preemption doctrine applied, as opposed to what extent it applied. We have never defined the precise contours of complete preemption under § 10501(b) or stated how broadly the complete preemption doctrine extends in the context of the ICCTA.

The STB has articulated a comprehensive test for determining the extent to which a particular state action or remedy is preempted by § 10501(b). However, the STB's test applies to ordinary preemption analysis under § 10501(b); the test does not necessarily apply to complete preemption. Nonetheless, as discussed below, the STB's test clarifies the status of routine crossing cases within the framework of the ICCTA and thus is instructive.

The STB's § 10501(b) preemption analysis distinguishes between two types of preempted state actions or regulations.  First, there are those state actions that are "categorically preempted" by the ICCTA because such actions "would directly conflict with exclusive federal regulation of railroads."  CSX Transportation, Inc.—Petition for Declaratory Order, STB Finance Docket No. 34662, 2005 WL 1024490, at *2–*3 (S.T.B. May 3, 2005).  Regulations falling within this first category are "facially preempted" or "categorically preempted" and come in two types:

> The first is any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized. . . .

> Second, there can be no state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines (see 49 U.S.C. 10901–10907); railroad mergers, line acquisitions, and other forms of consolidation (see 49 U.S.C. 11321–11328); and railroad rates and service (see 49 U.S.C. 10501(b), 10701–10747, 11101–11124).

Id. at *2 (citations and footnote omitted).  State actions such as these constitute "per se unreasonable interference with interstate commerce." Id. at *3.  As such, the preemption analysis for state regulations in this first category is addressed to "the act of regulation itself" and "not to the reasonableness of the particular state or local action."  Id.

The second category of preempted state actions and regulations are those that are preempted as applied.  Section 10501(b) of the ICCTA may preempt state regulations, actions, or remedies as applied, based on the degree of interference the particular state action has on railroad operations.  "For state or local actions that are not facially preempted, the section 10501(b) preemption analysis requires a factual assessment of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation."

Id. Citing our decision in Friberg, 267 F.3d at 439, the STB stated that "it is well settled that states cannot take an action that would have the effect of foreclosing or unduly restricting a railroad's ability to conduct any part of its operations or otherwise unreasonably burdening interstate commerce." Id. at *4.

The STB has clearly identified where routine crossing disputes, such as the one at issue in this case, fall in this scheme of ICCTA preemption. Routine crossing disputes are not typically preempted. Crossing disputes, despite the fact that they touch the tracks in some literal sense, thus do not fall into the category of "categorically preempted" or "facially preempted" state actions. The STB has explained that "[t]hese crossing cases are typically resolved in state courts." Maumee & W. R.R. Corp. and RMW Ventures, LLC–Petition for Declaratory Order, STB Finance Docket No. 34354, 2004 WL 395835, at *2 (S.T.B. March 2, 2004). "[R]outine, non-conflicting uses, such as non-exclusive easements for at-grade road crossings, wire crossings, sewer crossings, etc., are not preempted so long as they would not impede rail operations or pose undue safety risks." Id.; see also CSX Transp., Inc., 2005 WL 1024490, at *6 (approving the proposition that "a state's traditional authority over the safety of roads and bridges at grade-separated rail/highway crossings pursuant to other statutory schemes is not preempted by section 10501(b) so long as no unreasonable burden is imposed on a railroad"); City of Lincoln v. Surface Transp. Bd., 414 F.3d 858, 863 (8th Cir. 2005) (STB adopting the position that "it is well established that nonconflicting, nonexclusive easements across railroad property are not preempted if they do not hinder rail operations or pose safety risks."). Thus, within the STB's analytical framework, preemption claims in routine crossing cases fall into the category of as-applied preemption challenges.

The STB's position with respect to these routine crossing cases is consistent with the historical, pre-ICCTA rule governing these crossing disputes. As the Supreme Court long-ago explained:

> The care of grade crossings is peculiarly within the police power of the states, and, if it is seriously contended that the cost of this grade crossing is such as to interfere with or impair economical management of the railroad, this should be made clear. It was certainly not intended by the Transportation Act to take from the states or to thrust upon the Interstate Commerce Commission investigation into parochial matters like this, unless by reason of their effect on economical management and service, their general bearing is clear.

Lehigh Valley R.R. Co. v. Bd. of Pub. Util. Comm'rs, 278 U.S. 24, 35 (1928) (citations omitted); see also Erie R.R. Co. v. Bd. of Pub. Util. Comm'rs, 254 U.S. 394, 409 (1921) (Holmes, J.) ("It is well settled that railroad corporations may be required, at their own expense, not only to abolish existing grade crossings but also to build and maintain suitable bridges or viaducts to carry highways, newly laid out, over their tracks or to carry their tracks over such highways." (internal quotation marks omitted)).

The Railroad argues that the Louisiana statutory scheme for enclosed estate owners, which allegedly authorizes the Landowners' construction and use of these private at-grade crossings, is completely preempted by the ICCTA because the scheme prevents or unreasonably interferes with railroad operations. Framing the Railroad's argument within the structure of the STB's preemption analysis, the Railroad raises an as-applied preemption challenge to the Louisiana state law. However, the Railroad does not argue why the STB's test for ordinary preemption under the ICCTA should also govern or help define the scope of the distinct jurisdictional doctrine of complete preemption. More specifically, the Railroad fails to explain whether and why the fact-intensive inquiry for as-applied preemption challenges should be considered as part of a complete preemption analysis under § 10501(b).

We decline to define the precise contours of the complete preemption doctrine under the ICCTA. Even assuming that the complete preemption doctrine extends to as-applied preemption challenges, such as the one raised by the Railroad in this case, the Railroad has failed to demonstrate that the Louisiana scheme for enclosed estate owners unreasonably interferes with railroad operations.

The fatal defect in the Railroad's argument is that the Railroad fails to establish that any unreasonable interference with railroad operations is caused by operation or application of the Louisiana state law as opposed to the independent actions of private parties. The Railroad bears the burden of establishing that federal jurisdiction exists. The presumption against preemption applies with full force to this generally applicable state property law, even if applied to permit a private, at-grade railroad crossing. See In re Davis, 170 F.3d 475, 481 (5th Cir. 1999) (en banc) ("Deference to our federalism counsels a presumption that areas of law traditionally reserved to the states, like police powers or property law, are not to be disturbed absent the 'clear and manifest purpose of Congress.'"); Lehigh Valley R.R. Co., 278 U.S. at 35 ("The care of grade crossings is peculiarly within the police power of the states.").

Louisiana Civil Code Article 689 provides: "The owner of an estate that has no access to a public road may claim a right of passage over neighboring property to the nearest public road. He is bound to indemnify his neighbor for the damage he may occasion." This provision operates as follows:

> [Article 689] is not self-executing. It does however confer on the owner of an enclosed estate a legal servitude on the subordinate property which entitles the owner to a forced passage for indemnity. The enclosed landowner has the right to go into court and demand that the passage be fixed, and the establishment of the location of the right of way either through agreement or by judicial decision, is a conventional servitude of passage. See LA. CIV. CODE ANN. art. 689; A. YIANNOPOULOS, 4 LOUISIANA CIVIL LAW TREATISE, Predial Servitudes § 92 (3rd ed. 2004).

16

Batton v. United States, No. Civ.A. 05-1219, 2006 WL 568295, at*3 (W.D. La. Mar. 8, 2006) (Hayes, Mag. J.). Thus, by operation of law, the Landowners—as enclosed estate owners—have the right under Article 689 to demand a right of passage over the Railroad's tracks. Yet while Article 689 permits an enclosed landowner to demand a right of passage over neighboring lands, it does not authorize the enclosed landowner to exercise that right however the owner deems fit. Rather, to obtain the actual, fixed physical manifestation of this right of passage, the enclosed landowner must either go to court and demand that the passage be fixed or obtain an agreement from the owner of the subservient estate.

The Railroad complains that this Louisiana statutory scheme unreasonably interferes with railroad operations. However, the Railroad's primary support for this argument is misleading. To support this argument, the Railroad focuses on the alleged substandard at-grade crossings that the Landowners have installed and used, detailing how the number of these crossings, combined with the substandard workmanship of the crossings, increase the Railroad's operating costs and impair the Railroad's ability to regularly inspect and maintain its tracks in accordance with federal safety standards.

The Railroad does not allege that private crossings generally are fundamentally inconsistent with the Railroad's ability to operate. Rather, one aspect of the Railroad's complaint is that the Landowners have refused to obtain permits from the Railroad to operate these private crossings. Among other things, these permits would shift to the Landowners some of the Railroad's increased operating costs caused by the private railroad crossings. More importantly, these permits presumably would allow the Landowners to continue using the private crossings on terms and conditions approved by the Railroad. Thus, the Railroad's willingness and desire to enter into these permit

17

agreements suggests that there are methods for constructing and using these private crossings that minimize any interference with Railroad operations. We do not read the Railroad's complaint as suggesting that all crossings unreasonably interfere with railroad operations. Rather, the Railroad's primary complaint is that the particular implementation of the Landowners' private crossings unreasonably interferes with railroad operations.

The problem with the Railroad's argument based on the actual, fixed, physical implementation of these crossings is that the Railroad fails to link the interference caused by the implementation of these crossings to Article 689. The Railroad's complaint in reality is directed at the actions of private parties, not the operation of Article 689.

The law in Louisiana is clear: Article 689 is not self-executing. While Article 689 authorizes the Landowners to demand a right of passage over the Railroad's tracks, implementation of the right of passage must be fixed by either judicial order or the agreement of the parties. The Railroad has not alleged that any of the purported substandard private crossings at issue here were fixed by any judicial order entered under the authority of Article 689. Indeed, the Railroad's complaint acknowledges and alleges that the Landowners do not have a legal right to unilaterally install and use these private crossings. As such, the Railroad has failed to show that any interference with railroad operations allegedly caused by the construction and use of these substandard crossings can be attributed to operation of Article 689 as opposed solely to the conduct of private parties.[3]

---

[3] We take no position on the legal status of these crossings, many of which have existed well prior to the Railroad's acquisition of the track. We simply note that the Railroad has not satisfied its burden of establishing that Article 689 creates any conflicting scheme of state regulation subject to the complete preemption doctrine. We discuss these issues only to reach the conclusion that the federal courts lack subject matter jurisdiction over this crossing dispute. Because there is no federal jurisdiction in this case, none of our comments should be construed as passing on the substantive merits of this dispute.

In addition, the Railroad has not established that Article 689, as it actually operates, necessarily causes unreasonable interference with railroad operations. Article 689 is a generally applicable state property law that does not specifically apply to railroad crossings. This state law is capable of being applied in a manner that does not unreasonably interfere with railroad operations. First, Article 689 contains a cost-shifting mechanism; the law requires the enclosed estate owner to indemnify the owner's neighbor for any damages the right of passage may occasion. One of the Railroad's primary complaints about these crossings is the damages caused by the crossings in the form of increased operating costs. We doubt whether increased operating costs are alone sufficient to establish "unreasonable" interference with railroad operations. See, e.g., Lehigh Valley R.R. Co., 278 U.S. at 33–34 (requiring a railroad to bear an additional $100,000 expense in constructing an overheard crossing to preserve the straightness of a road for safety reasons held near, but not beyond, the line of reasonableness). Regardless, Article 689 can be interpreted to avoid the issue of costs entirely by shifting some of these costs to the Landowners.

The Louisiana statutory scheme for enclosed estates does not specifically apply to railroad crossings, and the scheme is silent on the proper placement and construction of such crossings. A strong rationale supports granting a forced right of passage for enclosed landowners: "As land becomes less available, more necessary for public habitation, use, and support, it would run contrary to public policy to encourage landlocking of such a valuable asset and forever removing it from commerce and from public as well as private benefit." Rockholt v. Keaty, 237 So.2d 663, 668 (La. 1970). The Louisiana statutory scheme for enclosed estate owners is sufficiently broad and flexible to permit the Louisiana courts to take account of this important public interest without unreasonably interfering with railroad operations. See generally Bailey v. McNeely, 918 So.2d 1124, 1130 (La. Ct. App. 3d Cir. 2005) ("After considering the record in this matter,

although the placement of the servitude by the trial court may not be the shortest route to the nearest public road, or the most economical passage, the trial court's judgment takes into account all the particular circumstances of the subject property, as well as existing servitudes, and provides the most practical, feasible and aesthetic resolution possible."); see also Erie R.R. Co., 254 U.S. at 410 ("Grade crossings call for a necessary adjustment of two conflicting interests—that of the public using the streets and that of the railroads and the public using them. Generically, the streets represent the more important interest of the two."). In light of these considerations, the Railroad has not established and we cannot conclude that Article 689 and the statutory scheme for enclosed estate owners necessarily would be applied in a manner that unreasonably interferes with railroad operations.

For these reasons, the Railroad has not established that § 10501(b) of the ICCTA completely preempts Article 689 and the Louisiana statutory scheme for enclosed estate owners. The Railroad has thus failed to establish jurisdiction on the basis of complete preemption under the ICCTA.[4]

C

The Railroad next argues that jurisdiction is proper because Article 689 is completely preempted by the Federal Railroad Safety Act ("FRSA"). The FRSA was enacted "to promote safety in all areas of railroad operations and to

---

[4] The parties do not address the fact that § 10501(b) of the ICCTA speaks of the "exclusive" jurisdiction of the STB with respect to certain matters related to regulation of rail transportation. The court in PCI Transportation likewise did not address this issue, although on remand in that case the district court ultimately dismissed the parties' claims as falling within the exclusive jurisdiction of the STB. See PCI Transp., Inc. v. Forth Worth & W. R.R. Co., Inc., No. 4:04-CV-211-Y (N.D. Tex. Sept. 26, 2006). Because the parties do not address the issue and because we conclude that there is no federal jurisdiction, we do not address this issue.

reduce railroad-related accidents, and to reduce deaths and injuries to persons . . . ." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 661 (1993). The FRSA grants the Secretary of Transportation broad power to promulgate regulations "for all areas of railroad safety." Id. at 662. The preemptive scope of the FRSA is outlined in 49 U.S.C. § 20106[5] and explained more fully by the Secretary's regulation on preemption:

> Under 49 U.S.C. 20106, issuance of these regulations preempts any State law, regulation, or order covering the same subject matter, except an additional or more stringent law, regulation, or order that is necessary to eliminate or reduce an essentially local safety hazard; is not incompatible with a law, regulation, or order of the United States Government; and that does not impose an unreasonable burden on interstate commerce.

49 C.F.R. § 213.2. In Lundeen v. Canadian Pac. Ry. Co., the Eighth Circuit held that the plaintiffs' state common law claim of negligent track inspection against a railroad was completely preempted by the FRSA. 447 F.3d 606, 614–15 (8th Cir. 2006). Whether a specific state statute or regulation is preempted by the FRSA may require a fact-intensive inquiry to determine the nature, if any, of the conflict between state and federal regulations. See, e.g., Mo. Pac. R.R. Co. v.

---

[5] Section 20106(a) provides:

> (2) A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order—
>
> > (A) is necessary to eliminate or reduce an essentially local safety or security hazard;
> >
> > (B) is not incompatible with a law, regulation, or order of the United States Government; and
> >
> > (C) does not unreasonably burden interstate commerce.

21

R.R. Comm'n of Tex., 833 F.2d 570, 575 (5th Cir. 1987) (remanding for further factual development regarding the overlap between federal track regulations and state regulations regarding walkway requirements); see also Mo. Pac. R.R. Co. v. R.R. Comm'n of Tex., 948 F.2d 179 (5th Cir. 1991) (affirming district court's decision that state walkway requirement was preempted).

We do not decide whether the complete preemption doctrine could ever apply in the context of the FRSA, because in this case it is clear that the complete preemption doctrine does not apply. The Railroad's FRSA complete preemption claim fails for many of the same reasons as its ICCTA claim. First, the Railroad has failed to allege any safety issue under the FRSA that arises from the operation or application of Article 689 as opposed to the actions of private parties. Article 689 is silent on how a right of passage over the Railroad's tracks should be implemented or how a crossing should be constructed. To the extent that the Railroad's argument for complete preemption under the FRSA is somehow based on the increased costs incurred by the Railroad to maintain their tracks in accordance with federal safety standards, we note again that Article 689 contains a specific cost-shifting mechanism that could be applied to alleviate these concerns. The Railroad bears the burden of establishing the court's jurisdiction, and we of course decline to presume that the Louisiana state courts would apply Article 689 in a manner that needlessly conflicts with federal safety standards for railroads.

In addition, the Railroad has not demonstrated that there are any federal safety standards regulating the implementation of private, at-grade crossings. The Federal Railroad Administration ("FRA"), the administrative body charged with enforcing the FRSA, has acknowledged that private crossings are governed by—if anything—state law, and not federal, law. See Safety of Private Highway-Rail Grade Crossings; Notice of Safety Inquiry, 71 Fed. Reg. 42716 (Dep't of Transp. July 27, 2006).

22

For these reasons, without deciding whether complete preemption under the FRSA might apply in other circumstances, we conclude that the Railroad has failed on the facts of this case to establish that the Louisiana statutory scheme for enclosed estate owners is completely preempted under the FRSA.

D

Finally, the Railroad argues that federal question jurisdiction is established because the Railroad's claims implicate significant federal issues, citing the doctrine first developed in Smith v. Kansas City Title & Trust Co., 255 U.S. 180 (1921). According to the Supreme Court's most recent formulation of this doctrine, "the question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 314 (2005).

Here, the Railroad argues that they have raised a disputed and substantial question of federal law arising from the need to control the Landowners' interference with its railroad right-of-way for providing interstate transportation services; the Railroad also states that there is a strong federal interest in maintaining railroad service throughout the country. However, the Railroad does not identify which state law claim it has asserted that (a) necessarily raises a stated federal issue that is (b) disputed and substantial and that (c) does not upset the federal and state balance. In essence, the Railroad's broad argument on this point attempts to establish federal jurisdiction on the basis of the general federal interest in interstate railroad transportation. In the absence of a more specific argument that attempts to address the standard outlined in Grable & Sons, we cannot conclude that the Railroad has raised a significant federal issue sufficient to establish federal question jurisdiction.

23

IV

We DISMISS that portion of the appeal challenging the district court's decision to remand the Rayborn action to state court.

With respect to the Railroad's declaratory judgment action, because the Railroad has failed to establish any basis for federal jurisdiction, we AFFIRM the district court's dismissal for want of jurisdiction.