# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 11, 2023

Lyle W. Cayce
Clerk

———————

No. 22-20573

———————

LNY 5003, L.L.C.; Fertitta Entertainment, Incorporated; Fertitta Hospitality, L.L.C.,

*Plaintiffs—Appellants*,

*versus*

Zurich American Insurance Company,

*Defendant—Appellee*.

———————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-2992

———————————————————

Before Wiener, Graves, and Douglas, *Circuit Judges*.

Per Curiam:[*]

Following the onset of the COVID-19 pandemic, Zurich American Insurance Company ("Zurich") denied coverage to seventeen covered restaurants owned by subsidiaries of Fertitta Entertainment, Inc. and Fertitta Hospitality, LLC (the "Fertitta Entities"), both Texas entities. Shortly after, the Fertitta Entities attempted to assign all "claims and causes of

———————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-20573

action" to LNY 5003, an entity that shared Illinois citizenship with Zurich, to bring claims of breach of contract and violations of the Texas Insurance Code in Texas state court. Zurich removed the case to federal court in Texas, and the district court subsequently denied a motion to remand and granted a motion to dismiss all claims.

Finding the assignment invalid, we hold that diversity jurisdiction exists between the Fertitta Entities and Zurich, as citizens of Texas and Illinois. We therefore AFFIRM the district court's finding that it retained subject matter jurisdiction over the dispute in denying the motion to remand.

As to the merits, despite the Fertitta Entities' best attempts, they needed to plausibly plead that the COVID-19 virus caused direct physical damage to their property. They cannot do so. Accordingly, we also AFFIRM the district court's decision to grant Zurich's motion to dismiss.

## I.

## A.

In 2019, Zurich issued a commercial insurance policy (the "Policy") to two insureds, the Fertitta Entities, to cover 17 international restaurants owned by subsidiaries of the Fertitta Entities. The majority of those 17 restaurants are owned by a subsidiary, Morton's of Chicago, Inc. ("Morton's"), and are located throughout Asia and North America. Relevant to this appeal, Zurich is a New York corporation with a principal place of business in Illinois. The Fertitta Entities are citizens of Texas. Morton's is an Illinois corporation with a principal place of business in Illinois.

The Policy incorporates coverages for various losses between May 31, 2019 to May 31, 2020. In 2020, the onset of the COVID-19 pandemic resulted in significant business losses to the 17 covered restaurants.

According to the operative complaint, these losses were due to the presence of COVID-19 on the premises, the ensuing public panic, and related local government lockdown orders. The Fertitta Entities specifically alleged that "[t]he presence of individuals infected with COVID-19 led to the covered properties becoming contaminated with the virus, rendered the premises, including property located at the premises unsafe, and resulting [sic] in direct physical loss of and damage to the covered properties."

In April 2020, the Fertitta Entities submitted a notice of loss to Zurich. Zurich indicated that it would deny all COVID-19 related claims under the Policy. Shortly after Zurich's denial, in July 2020, for the nominal price of $10, the Fertitta Entities assigned "all right, title, and interest" they had "in any and all claims" against Zurich under the Policy to LNY 5003, LLC ("LNY"), a Texas LLC formed in early 2020.

The Policy, however, includes an "anti-assignment clause" that expressly precluded the Fertitta Entities from making assignments without Zurich's consent. It states: "Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured." In making the assignment, the Fertitta Entities retained "no interest in the Assigned Claims whatsoever," and any recovery from the assigned claims belonged to LNY. However, LNY confirmed before the district court that the Fertitta Entities retained a financial interest in LNY.

Despite being formed in Texas by Texan entities, LNY's sole member is Morton's, a corporation with Illinois citizenship, as noted. Morton's is both the sole member of LNY and a direct subsidiary of Fertitta Entertainment, Inc. The creation and assignment of claims to LNY was an attempt to destroy complete diversity between the parties because of its common citizenship with Zurich.

No. 22-20573

## B.

Eighteen days after the assignment, LNY sued Zurich in Harris County state court, asserting claims for breach of contract and violations of the Texas Insurance Code. LNY filed the action without pleading its relationship to Fertitta or alleging the existence of the assignment, instead bringing the action as though it were the insured under the Policy. Zurich filed an answer and removed the case to federal court, asserting diversity jurisdiction. Zurich claimed that LNY's Illinois citizenship (through its sole member, Morton's) should be disregarded because LNY was not an insured. Because the insured Fertitta Entities were citizens of Texas, Zurich argued, there was complete diversity.

LNY sought remand under the United States Supreme Court's decision in *Provident Savings Life Assurance Society of New York v. Ford*, 114 U.S. 635 (1885) and its progeny. Zurich countered that LNY's assignment was not complete or valid and should be disregarded. The parties also disagreed regarding whether the anti-assignment provision in the Policy prohibited the transfer of the insureds' "rights or duties under this policy" without Zurich's written consent. After briefing and a hearing, the district court denied LNY's motion to remand. In response to this ruling, the Fertitta Entities—the insured and assignors—were added as plaintiffs.

Zurich then moved to dismiss the claims under Federal Rule of Civil Procedure 12(b)(6) and 12(b)(1). The district court granted the motion to dismiss on both grounds. This appeal of both the order denying the motion to remand and granting the motion to dismiss for failure to state a claim followed.[1]

---

[1] Appellants do not challenge the dismissal of LNY for lack of subject matter jurisdiction under FED. R. CIV. P. 12(b)(1).

## II.

We review both issues presented in this appeal de novo. *Gilmore v. Miss.*, 905 F.3d 781, 784 (5th Cir. 2018) (denial of motion to remand is reviewed de novo); *Calogero v. Shows, Cali & Walsh, LLP*, 970 F.3d 576, 580 (5th Cir. 2020) (grant of motion to dismiss is reviewed de novo). In considering the motion to dismiss, we accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *See Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007).

## III.

### A. Motion to Remand

Beginning first with jurisdiction, 28 U.S.C. § 1332(a)(1) establishes diversity jurisdiction over controversies between citizens of different states with an amount in controversy exceeding $75,000. Section 1441(a) permits a defendant to remove an action from state court to federal court if diversity jurisdiction exists. 28 U.S.C. § 1441(a). But the action must be remanded under 28 U.S.C. § 1447(c) if "at any time before final judgment it appears that the district court lacks subject matter jurisdiction."

The removing party bears the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 327 (5th Cir. 2008) (citations omitted). The existence of subject matter jurisdiction is determined at the time of removal. *Manguno v. Prudential Prop. & Cas. Ins.*, 276 F.3d 720, 723 (5th Cir. 2002). This includes consideration of "the claims in the state court petition as they existed at the time of removal." *Id.* (citation omitted).

The Supreme Court has held that "the citizens upon whose diversity a plaintiff grounds jurisdiction must be real and substantial parties to the controversy." *Navarro Sav. Assoc. v. Lee*, 446 U.S. 458, 460 (1980) (internal

marks and citation omitted). Federal courts "must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy." *Id.* at 461 (citation omitted). Further, federal courts "may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts of the protection of their rights in those tribunals." *Ala. Great S. Ry. Co. v. Thompson*, 200 U.S. 206, 218 (1906).

In determining that it retained subject matter jurisdiction over the parties, the district court made six findings: (1) the at-issue assignment was invalid under the plain terms of the Policy, (2) the Fertitta Entities and Zurich are the "real parties" to this controversy, (3) complete diversity exists among the parties, (4) Zurich met its burden of proving subject matter exists, (5) LNY's motion to remand must be denied, and (6) LNY cannot proceed further in this action as plaintiff.

Before us, the Fertitta Entities argue that federal courts should not look behind a complete assignment of claims that eliminates diversity, relying on and claiming their "complete assignment of claims" fits squarely within the Supreme Court's decision in *Provident*, 114 U.S. 635. Zurich counters that reliance on *Provident* is unavailing when an assignment is invalid or incomplete, and that the assignment at issue was invalid under Texas law because it violated the anti-assignment provision in the Policy.

We first turn to *Provident*. There, an individual judgment creditor (a resident of Ohio) assigned his entire interest in a judgment against Provident (a New York corporation) to the plaintiff (a resident of New York). The assignee then sought to collect the judgment in New York state court, diversity being destroyed. 114 U.S. 635, 636-37. Provident removed the matter, arguing that diversity jurisdiction existed because the assignment was fraudulent, and the assignor was the real party in interest. *Id.* at 637, 640. The Supreme Court disagreed, acknowledging the fraudulent assignment but

rejecting removal. "The plain answer to this position is that the action was nevertheless [the assignee's], and as against him there was no right of removal. If he was a mere tool of [the assignor], and if the latter was the person really interested in the cause, the action could not have been sustained" because state law would provide adequate protections. *Id.* at 640. Instead, the Court was satisfied that a fraudulent assignment may "be a good defense to an action in a state court" but "not a ground of removing that cause into the federal court." *Id.* at 641.

Our court is no stranger to *Provident*, having grappled with it previously in *Grassi v. Ciba-Geigy, Ltd.*, 894 F.2d 181 (5th Cir. 1990). In *Grassi*, which involved a partial assignment, we stated that *Provident* and its progeny stand for two propositions: (1) "federal courts lack the power to look beyond the pleadings in determining the existence of diversity jurisdiction" absent specific statutory authorization and (2) "state law and the state court systems will adequately defend a defendant's right to removal jurisdiction against devices designed to defeat it." *Id.* at 183. But "[t]hese propositions have not fared well since 1887." *Id.*

The first proposition has been "largely abandoned" in subsequent decisions "recogniz[ing] that federal courts do possess some inherent authority to look beyond the pleadings in order to protect a litigant's right to diversity jurisdiction." *Id.* We went on to quote *Wecker v. Nat'l Enamelling & Stamping Co.*, 204 U.S. 176 (1907), in which the Court held that diversity jurisdiction was not defeated by joinder of a nondiverse defendant who could not conceivably be liable and declaring that federal courts "should not sanction devices intended to prevent a removal to a Federal court where one has the right, and should be equally vigilant to protect the right to proceed in the Federal court as to permit the state courts, in proper cases, to retain their own jurisdiction." *Id.* (quoting *Wecker*, 204 U.S. at 185-86). Similarly, in *In the Matter of the State of Neb.*, 209 U.S. 436 (1908), the Supreme Court upheld

a circuit court's refusal to remand a case solely because Nebraska was listed as a plaintiff, holding that it was the duty of the federal court to determine whether Nebraska was an actual party plaintiff. *Grassi*, 894 F.3d at 183.

The second proposition under *Provident* and its progeny "has proved untrue in practice." *Id.* We found that "[r]eliance upon state law for the determination of federal court jurisdiction was ultimately rejected by the Supreme Court in *Kramer*." *Id.* at 184. In *Kramer v. Caribbean Mills, Inc.*, also involving a partial assignment, the Supreme Court rejected the argument that because the assignment was valid under state law, federal courts were bound to respect it. 394 U.S. 823, 824-25 (1969). "The existence of federal jurisdiction is a matter of federal, not state law." *Id.* at 829. Finding the assignment collusive, the Supreme Court disregarded the assignment for determining jurisdiction. *Id.* at 828-29. Noting our own holdings that recognize the authority of federal courts to protect their own jurisdiction, *Grassi* held that "federal district courts have both the authority and the responsibility, under 28 U.S.C. §§ 1332 and 1441, to examine the motives underlying a partial assignment which destroys diversity and to disregard the assignment in determining jurisdiction if it be found to have been made principally to defeat removal." *Id.* at 185.

*Provident* remains binding law, despite it not being revisited by the Supreme Court in almost 150 years. "Although the basic propositions for which *Provident* and its progeny stand have been abandoned, the Supreme Court has not had formal occasion to reexamine the ruling since 1887." *Grassi*, 894 F.2d at 184. In *Grassi*, we opted not to extend *Provident*'s holding to cases involving partial assignments, empowering federal courts to examine the motives underlying a partial assignment. *See id.* at 185.

Here, again, we decline to extend *Provident*'s holding to cases where the claims at issue derive from a contractual relationship that specifically

includes an anti-assignment clause. When an anti-assignment clause renders an assignment invalid, federal courts have the authority and responsibility to examine the validity of those assignments for purposes of diversity jurisdiction.

*Provident* and its progeny control "where assignments of a complete cause are concerned." *Grassi*, 894 F.2d 181, 183 (5th Cir. 1990). More precisely, as the district court noted, *Provident* applies "where what's before the court is indisputably a complete assignment," as this was the precise scenario presented in *Provident*. Here, the claims at issue derive from a contractual relationship that expressly forbid assignments without Zurich's written consent. Whether the assignment is complete depends on whether the assignment itself is valid under the contract. As aptly stated by the district court, "if invalid, the assignment didn't actually happen at all—much less in the sense of being complete."

Here, the Fertitta Entities' attempted assignment to LNY was invalid. This conclusion is supported by both Texas law and our own. "Texas law permits the enforcement of no-assignment clauses in insurance policies." *Conoco, Inc. v. Republic Ins. Co.*, 819 F.2d 120, 124 (5th Cir. 1987). Moreover, violations of the Texas Insurance Code are not assignable under Texas law. *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd.*, 146 S.W.3d 79, 87 (Tex. 2004). Accordingly, Texas law supports the validity of the anti-assignment clause, and specifically rejects the assignment of the exact claims at issue in the instant matter.

This holding also tracks our prior decision in *Keller Found., Inc. v. Wausau Underwriters Ins. Co.*, 626 F.3d 871 (5th Cir. 2010). There, a purchase agreement transferred nearly all assets of an insured to the plaintiff. *Id.* at 872-73. An anti-assignment clause in the insurance policy barred the transfer of "rights and duties" of the insured. *Id.* at 873. The plaintiff was

later sued for harm arising from work done by the insured prior to the purchase and transfer. *Id.* The insurance company refused to provide coverage and the plaintiff brought an action alleging breach of contract, violations of the Texas Insurance Code, and breach of the duty of good faith and fair dealing. *Id.* We first noted that Texas courts "enforce non-assignment clauses even for assignments made post-loss." *Id.* at 874. We then held that the assignment was barred by the policy's anti-assignment clause because the plaintiff was trying to obtain coverage under the policy. *Id.* at 875. We specifically stated that the plaintiffs could not "circumvent the non-assignment clause by casting the transfer of the insurance coverage as the transfer of a chose in action." *Id.* (internal marks omitted).

The Fertitta Entities attempt to differentiate "rights and duties" from "claims and causes of actions" is unavailing. Our court has categorized such distinctions as "specious." *See Conoco*, 819 F.2d at 124 (rejecting plaintiff's argument that it was not assigned a "claim or demand" but "proceeds"). As in *Keller*, plaintiffs here are attempting to obtain coverage under the Policy. They may not "circumvent the non-assignment clause" by arguing that its prohibition on the assignment of "rights and duties" does not preclude an assignment of "claims or cause of action." This is especially true when their own state court petition makes clear that LNY is pursuing its *own* claims as if it were *itself* insured under the Policy.

Because the assignment was invalid, diversity jurisdiction exists between the Fertitta Entities and Zurich, as citizens of Texas and Illinois respectively. We therefore affirm the district court's holding that it retained subject matter jurisdiction over the dispute in denying the motion to remand.

## B. Motion to Dismiss

Turning to the motion to dismiss, in the complaint, the Fertitta Entities alleged that they suffered "direct physical loss of and damage to the

No. 22-20573

seventeen covered restaurants as a result of the COVID-19 pandemic, the public's fear of the coronavirus, and the resulting civil unrest and government lockdown orders." Specifically, "[t]he presence of individuals infected with COVID-19 led to the covered properties becoming contaminated with the virus, rendered the premises, including property located at the premises unsafe, and resulting in direct physical loss of and damage to the covered properties." Further, the "presence of COVID-19 physically altered the covered properties" by "rendering those properties unsafe, and thereby depriving Plaintiffs of their possession and use of the covered properties." Because the pandemic required the restaurants "to suspend operations and customers were not permitted to dine inside," Fertitta alleged its restaurants could not generate revenue.

The Fertitta Entities now argue that the district court erred in granting Zurich's motion to dismiss after finding that the presence of COVID-19 could not cause a physical loss or damage to property. Zurich counters that the district court properly dismissed the complaint because Fertitta failed to plead direct physical loss of or damage to property as required under the Policy. The limited coverages for "microorganisms" do not alter the meaning of "direct physical loss of or damage to" property. Instead, the microorganism exclusion bars coverage because it unambiguously excludes losses directly or indirectly caused by the virus.

Texas law governs our interpretation of the insurance policy. "Texas law provides that insurance policies are construed according to common principles governing the construction of contracts, and the interpretation of an insurance policy is a question of law for a court to determine." *Am. Intern. Specialty Lines Ins. Co.*, 620 F.3d at 562 (citing *New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996)). We limit our inquiry to the four corners of the underlying complaint and the four corners of the Policy, and "interpret the contract to discern the intention of the parties from

the language expressed in the policy." *Id.* All the provisions must be considered with reference to the whole instrument. *Id.* (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). "The policy's terms are given their ordinary and generally-accepted meaning unless the policy shows the words were meant in a technical or different sense." *Gilbert Tex. Const., LP v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010).

If a policy is subject to more than one reasonable interpretation, it is ambiguous. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus. Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). "Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation." *Id.* (citation omitted). When an insurance policy is ambiguous, and the parties offer conflicting reasonable interpretations of the policy, Texas law favors adopting the interpretation in favor of the insured. *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015). But a policy is only ambiguous "if, after applying the rules of construction, it remains subject to two or more reasonable interpretations." *Id.* at 119 (internal quotation marks and citation omitted).

Here, we find no ambiguity in the Policy, and our caselaw firmly forecloses the arguments offered by the Fertitta Entities. The six coverages at issue in this appeal require "direct physical loss of or damage to" covered property. We have held that under Texas law, "direct physical loss of property" means "a tangible alteration or deprivation of property." *Terry Black's Barbecue v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 458 (5th Cir. 2022). And a restaurant does not suffer a "direct physical loss of property" when it must suspend dine-in services because of local, state, or national COVID-19 regulations. *See id.* at 455. That would seemingly end the argument as to these six coverage provisions.

No. 22-20573

Fertitta appears to argue that this case is different from the several we have already considered and rejected because the virus itself, rather than the closure orders, tangibly altered the properties, and that the Policy expressly contemplates that microorganisms, including viruses, can physically damage property.[2] This is akin to the argument made in *Am. Liberty Hosp., Inc. v. Cont'l Cas. Co.*, 2022 WL 2669465 (S.D. Tex. July 11, 2022), when the plaintiff argued that COVID-19 "became affixed to the Covered Properties after infected persons were present," thereby "damag[ing] the insured properties" and "render[ing] them unusable and dangerous to the public." *Id.* at *2. To the extent Appellants contend that its properties were "physically contaminated," this distinction is unavailing. As the district court noted in *Am. Liberty Hosp.*, "contamination of objects or properties" by COVID-19 "is transient and does not physically alter them." *Id.*

Our court has spoken to variations of this argument numerous times and each time flatly rejected it. In *PS Bus. Mgmt., LLC v. Fireman's Fund Ins. Co.*, No. 21-30723, 2022 WL 2462065 (5th Cir. July 6, 2022) (unpublished), we stated that "COVID-19 is a virus that injures people, not property." *Id.* at *3 (internal marks and citation omitted). In *Ferrer & Poirot, GP v. Cincinnati Ins. Co.*, 36 F.4th 656, 658 (5th Cir. 2022), we stated that COVID-19 did not cause "physical loss or damage to insured property" because "[w]hile COVID-19 has wrought great physical harm to people, it does not physically damage property within the plain meaning of 'physical.'"

───────────────

[2] This provision is not superfluous simply because it is inapplicable to the coronavirus. Zurich provides an example of when a virus might cause direct physical loss or damage by pointing to living things like livestock, which can be a type of property. *See also Curtis O. Griess & Sons, Inc. v. Farm Bureau Ins. Co.*, 528 N.W.2d 329, 331 (Neb. 1995) (pseudorabies virus carried by windstorm infected and killed swine). It also notes that "some microorganisms can cause direct physical loss or damage when they tangibly alter property, such as if mold infiltrated a property's walls after a water pipe bursts."

(citations omitted). Significantly, Fertitta "was not deprived of its property nor was there a tangible alteration to its property," so there was no direct loss to trigger coverage. *Id.* In *Aggie Invs. LLC v. Cont'l Cas. Co.*, 2022 WL 257439 (5th Cir. 2022), we discussed in detail why physical loss of property cannot reasonably be interpreted to mean loss of use. *Id.* at *2. First, we noted that by including the term "physical," the policy necessarily contemplated a loss that is nonphysical and thus excluded. *Id.* Further, as here, the policy provides for a "period of restoration" which contemplated that the loss suffered requires a period for repair. *Id.* We found no ambiguity in the "direct physical loss of property" language. *Id.* at *3. As stated in *Terry Black's Barbecue*, this conclusion is consistent with every other circuit court to interpret this language in the context of losses caused by civil authority orders closing nonessential businesses during the COVID-19 pandemic. *See* 22 F.4th at 457 (collecting cases).

Despite Fertitta's best attempts, it needed to plausibly plead that the COVID-19 virus caused physical damage to its property. It cannot do so. When the plaintiff seeks insurance coverage, if the insurance policy "precludes recovery under its very terms, dismissal is proper." *IberiaBank Corp. v. Ill. Union Ins. Co.*, 953 F.3d 339, 345 (5th Cir. 2020) (citation omitted). The district court correctly dismissed these claims, as the arguments raised by the Fertitta Entities are solidly foreclosed by precedent.

AFFIRMED.